**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **ELIZABETH HIGGINS** and ) | COMPLAINT FOR |
| **SHAWN SIMOENS**, as co-Personal ) | MONETARY DAMAGES |
| Representatives of the Estate of ) | UNDER 42 U.S.C. §1983 |
| Alexander T. Simoens; and ) | |
| **ELIZABETH HIGGINS** and ) | |
| **SHAWN SIMOENS**, daughter and son ) | |
| Alexander T. Simoens, deceased, ) | DEMAND FOR JURY TRIAL |
| ) | ON ALL ISSUES TRIABLE |
| Plaintiffs, ) | BY A JURY |
| ) | |
| *vs.* ) | No. |
| ) | |
| **JOACHIM DANKIW;** ) | |
| **JEANELLE MOORE;** ) | |
| **ANDREW FREEMAN;** ) | |
| **MARK HAEFELE;** ) | |
| **CHARLES BENAK;** ) | |
| **CHIEF OF POLICE;** ) | |
| **JIM SUTTLE;** ) | |
| **FRANK BROWN;** ) | |
| **JIM VOKAL;** ) | |
| **GARRY GERNANDT;** ) | |
| **DAN WELCH;** ) | |
| **FRANKLIN THOMPSON;** ) | |
| **CHUCK SIGERSON, JR.;** ) | |
| **THOMAS WARREN;** ) | |
| **THE CITY OF OMAHA;** ) | |
| **OMAHA POLICE DEPARTMENT;** ) | |
| **THE CITY COUNCIL;** ) | |
| **JOHN AND JANE DOES 1-14** ) | |
| (agents, servants and employees of ) | |
| the City and/or OPD who were on ) | |
| duty at the City jail from September ) | |
| 7, 2007, through September 9, 2007, ) | |
| whose real names are unknown) and ) | |
| **JOHN AND JANE DOES 15-25** ) | |
| (other agents/servants/employees of the ) | |
| City and/or OPD who knew/should ) | |
| have known of the events at the City jail ) | |
| from September 7-9, 2007, whose real ) | |
| names are unknown, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**

## COMPLAINT TABLE OF CONTENTS

| Part | Count | Defendants and Subject Matter | Page(s) |
|------|-------|-------------------------------|---------|
| 1 | | All Defendants (Jurisdiction, parties and venue allegations) | 1-6 |
| 2 | | All Defendants (General Allegations) | 6-16 |
| 3 | I | Defendants Dankiw, Moore, Freeman, Haefele, John and Jane Does 1-14, and John and Jane Does 15-25 in their individual capacities (§1983, deliberate indifference to medical needs, compensatory and punitive damages sought) | 16-20 |
| | II | Defendants Dankiw, Moore, Freeman, Haefele, John and Jane Does 1-14, and John and Jane Does 15-25 in their official capacities; Defendants Suttle, Brown, Vokal, Gernandt, Welch, Thompson, Sigerson, Benak and Warren in their official capacities; Defendants the City of Omaha, the Police Department, the Chief of Police, and the City Council, all as institutional defendants (§1983, deliberate indifference to medical needs, compensatory damages sought) | 20-29 |
| Prayer for Relief | | Count I: Compensatory damages in an amount that is fair and reasonable, and individual awards of punitive damages against each Defendant | 20 |
| Prayer for Relief | | Count II: Compensatory damages in an amount that is fair and reasonable | 29 |
| Jury Demand | | Demand for trial by jury pursuant to Rule 38(a) of the Federal Rules of Civil Procedure | 31 |
| Place of Trial | | Designation of Omaha as the place of trial | 32 |

## COMPLAINT

Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, complaining of Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; Charles Benak; the Chief of Police of the City of Omaha; Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson; Chuck Sigerson, Jr.; Thomas Warren; The City of Omaha; Omaha Police Department; the City Council; John and Jane Does 1-14, and John and Jane Does 15-25, allege:

### PART 1: PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs Elizabeth Higgins and Shawn Simoens are the duly-appointed co-Personal Representatives of the Estate of Alexander T. Simoens, and are bringing suit in that capacity.

2.      Plaintiffs Elizabeth Higgins and Shawn Simoens, in their individual capacities are bringing suit as the daughter and son, and the sole heirs at law, of Alexander T. Simoens, deceased ("Mr. Simoens").

3.      At all times relevant to this litigation, Defendant Joachim Dankiw ("Mr. Dankiw") has been an agent, servant, or employee of Defendant City of Omaha ("the City") and/or the Omaha Police Department ("the OPD"). At all times Mr. Dankiw was acting in the course and scope of his employment or other business relationship with the City and/or the OPD, working as a detention technician, or some similar or related job title, assigned to the Omaha City Jail ("the jail"). He is being sued in both his official and individual capacities, and was at all times acting under color of state law.

5.     At all times relevant to this litigation, Defendant Jeanelle Moore ("Ms. Moore") has been an agent, servant, or employee of the City and/or the OPD. At all times Ms. Moore was acting in the course and scope of her employment or other business relationship with the City and/or the OPD, working as a detention technician, or detention supervisor, or some similar or related job title, assigned to the jail. She is being sued in both her official and individual capacities, and was at all times acting under color of state law.

6.     At all times relevant to this litigation, Defendant Andrew Freeman ("Mr. Freeman") has been an agent, servant, or employee of the City and/or the OPD. At all times Mr. Freeman was acting in the course and scope of his employment or other business relationship with the City and/or the OPD, working as a detention technician, or some similar or related job title, assigned to the jail. He is being sued in both his official and individual capacities, and was at all times acting under color of state law.

7.     At all times relevant to this litigation, Defendant Mark Haefele ("Mr. Haefele") has been an agent, servant, or employee of the City and/or the OPD. At all times Mr. Haefele was acting in the course and scope of his employment or other business relationship with the City and/or the OPD, working as a detention technician, or some similar or related job title, assigned to the jail. He is being sued in both his official and individual capacities, and was at all times acting under color of state law.

8.     At all times relevant to this litigation, Defendant Charles Benak ("Mr. Benak") has been an agent, servant, or employee of the City and/or the OPD. At all times Mr. Benak was acting in the course and scope of his employment or other business relationship with the City and/or the OPD, working as the over-all supervisor or manager of the jail. He is being sued in his official capacity, and was at all times acting under color of state law.

$-2-$

9.     At all times relevant to this litigation, Defendant the Chief of Police of the City of Omaha ("Chief of Police"), has been an agent, servant or employee of the City and/or the OPD, acing in the course and scope of his employment or other business relationship with the City and/or the OPD, and acting at all times under color of state law. The Chief of Police acts as the over-all supervisor or manager of the OPD and is the highest-ranking member of the OPD. As of the filing of this suit, the City has named Deputy Chief Eric Buske as interim Chief of Police. The Chief of Police in office at the time of the events giving rise to this litigation was Thomas Warren, whose resignation is effective on January 11, 2008. The Chief of Police is being sued in his official capacity.

10.     At all times relevant to this litigation, Defendant Jim Suttle ("Mr. Suttle") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

11.     At all times relevant to this litigation, Defendant Frank Brown ("Mr. Brown") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

12.     At all times relevant to this litigation, Defendant Jim Vokal ("Mr. Vokal") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

13.     At all times relevant to this litigation, Defendant Garry Gernandt ("Mr. Gernandt") has been a member of the City Council of the City of Omaha, acting in the course

and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

14.     At all times relevant to this litigation, Defendant Dan Welch ("Mr. Welch") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

15.     At all times relevant to this litigation, Defendant Franklin Thompson ("Mr. Thompson") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

16.     At all times relevant to this litigation, Defendant Chuck Sigerson, Jr., ("Mr. Sigerson") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City and the OPD. He is being sued in his official capacity, and was at all times acting under color of state law.

17.     At the time of the events giving rise to this litigation, Defendant Thomas Warren ("Mr. Warren") was an agent, servant, or employee of the City and/or the OPD, acting in the course and scope of his employment or other business relationship with the City and/or the OPD. At the time of the events giving rise to this litigation, Mr. Warren was the Chief of Police and was the over-all supervisor or manager of the OPD and was the highest-ranking member of the OPD. Mr. Warren is being sued in his official capacity, and was at all times acting under color of state law.

18.     Defendant The City of Omaha ("the City") is a political subdivision of the State of Nebraska, and was at all times acting under color of state law.

− 4 −

19.     Defendant Omaha Police Department ("OPD") is a department or division of the City which has the responsibility for providing police services to the residents of the City, as well as to business, social and/or recreational invitees, and was at all times acting under color of state law.

20.     The City Council is the governing body of the City, and is being sued in that capacity.   The City Council has the ultimate authority over the policies, practices, rules, regulations, operations and procedures of the City, including but not limited to the OPD and the jail. The City Council was at all times acting under color of state law.

21.     At all times relevant to this litigation, Defendants John and Jane Does 1-14, whose names are presently unknown to Plaintiffs, were agents, servants or employees of the City and/or OPD who were on duty at the Omaha City Jail from the time Mr. Simoens arrived at the jail on September 7, 2007, through the time at which Mr. Simoens was transferred by ambulance from the jail to Creighton University Medical Center on September 9, 2007.   At all times Jane and John Doe Defendants 1-14 were acting in the course and scope of their employment or other business relationship with the City and/or the OPD.   They are being sued in their official and individual capacities, and were at all times acting under color of state law.

22.     At all times relevant to this litigation, Defendants John and Jane Does 15-25, whose names are presently unknown to Plaintiffs, were agents, servants or employees of the City and/or OPD between the time Mr. Simoens arrived at the jail on September 7, 2007, through the time at which Mr. Simoens was transferred by ambulance from the jail to Creighton University Medical Center on September 9, 2007, who had knowledge during that time frame, or who should or could have had knowledge during that time frame, of the events giving rise to this litigation (as described in Part 2 below), regardless of whether any or all of them were

– 5 –

technically on duty at the time. At all times Jane and John Doe Defendants 14-25 were acting in the course and scope of their employment or other business relationship with the City and/or the OPD. They are being sued in their official and individual capacities, and were at all times acting under color of state law. Hereinafter, John and Jane Does 1-25; Mr. Dankiw; Ms. Moore, Mr. Freeman and Mr. Haefele will be collectively referred to as "the on-duty Defendants."

23.     This Court has jurisdiction as this suit is being brought pursuant to 42 U.S.C. §1983, as this suit alleges violations of Mr. Simoens' rights under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

24.     In this Complaint, Defendants fall into three groups and may from time to time be collectively referred to by the applicable group identifications:

a.      Institutional Defendants: The City, the OPD, the Chief of Police and the City Council;

b.      Official Defendants: The seven members of the City Council; Mr. Warren; Mr. Benak; Mr. Dankiw; Ms. Moore; Mr. Freeman; Mr. Haefele, and John and Jane Does 1-25, and

c.      Individual Defendants: Mr. Dankiw; Ms. Moore; Mr. Freeman; Mr. Haefele, and John and Jane Does 1-14, and John and Jane Does 15-25.

25.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(a) in that the events giving rise to this action occurred within this judicial district and specifically in the City of Omaha, in Douglas County.

## PART 2: GENERAL ALLEGATIONS

26.     On or about September 7, 2007, at approximately 8:10 p.m., OPD officers arrested Mr. Simoens for various traffic violations.

– 6 –

27. Mr. Simoens was then transported to the Omaha City Jail ("the jail"), where he was booked and detained.

28. At the time Mr. Simoens arrived at the jail he had a pre-existing ulcerous medical condition. Mr. Simoens was aware that failure to treat this condition in a timely and proper manner could have serious and potentially lethal consequences for him. Mr. Simoens had also been informed by one of more of his health care providers that over-the-counter medications would generally be able to control or relieve any symptoms relating to his ulcer, such as gastrointestinal pain, if promptly taken.

29. As a pretrial detainee at the jail, under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, Mr. Simoens had the following minimum constitutional rights:

    a.    Timely, adequate and appropriate medical care;

    b.    To be personally observed during his detention in the jail with sufficient frequency so that any observable change in his physical or medical condition could be seen;

    b.    To have jail employees stationed adjacent to the area where he was held, in sufficiently close proximity for the jail employee to hear and promptly respond to his calls for medical help, or to have some other method that enabled jail employees to hear his calls for medical help other than waiting for a jail employee to make the rounds;

    c.    To have a pre-admission medical screening, or alternatively a post-admission medical screening shortly after admission to the jail, with the screening to be conducted by a jail employee trained for that purpose, and trained to determine

– 7 –

if immediate medical attention is needed for the detainee;

d.    To have accurate records of his health and medical condition maintained, and the information in them accurately conveyed to each succeeding shift;

e.    To be detained in a healthful environment with access to adequate medical care;

f.    To have proper medical attention provided as soon as possible after any indication that he was ill, and

g.    To have jail employees, regardless of rank or title, treat him in a professional manner, which would not include verbal or physical abuse by the jail employee.

30.    Prior to Mr. Simoens' admission to the jail, no one conducted a pre-admission medical screening, which should have included, but not have been limited to, inquiries of Mr. Simoens as to any current illness or health problems; any medications he was taking; any special health requirements he might have had, and any other health problems identified by his physician(s).

31.    After Mr. Simoens' admission to the jail, no one conducted a post-admission medical screening, which should have included, but not have been limited to, inquiries of Mr. Simoens as to any current illness or health problems; any medications he was taking; any special health requirements he might have had, and any other health problems identified by his physician(s).

32.    Had a pre-admission or prompt post-admission medical screening occurred, the on-duty Defendants would have learned that Mr. Simoens had a severe ulcer condition which required regular medication, and that the failure to provide such medication could have serious adverse consequences to Mr. Simoens' health.

33.    Alternatively, if any pre-admission or prompt post-admission medical screening

– 8 –

was undertaken by one or more on-duty Defendants, the screening was: (a) grossly inadequate in that it failed to elicit complete and accurate information from Mr. Simoens as to his then-current medical condition, or (b) the screening obtained complete and accurate information, but the screener chose to ignore the information and not have Mr. Simoens examined by a licensed medical professional, or chose not to communicate that information to anyone else on the shift during which Mr. Simoens was admitted or chose not to ensure, or otherwise failed to ensure, that the information was conveyed to the next shift.

34.     At or after the time Mr. Simoens was booked and detained at the jail, Mr. Simoens advised OPD and the City, through the on-duty Defendants, including but not limited to the booking officer or other employee of the City/OPD performing that function on the evening of September 7, 2007, of his need for medical attention; that he had a previous medical condition which could require urgent medical care, including but not limited to medication which he did not have in his possession at the time of his arrest and booking and detention at the jail, and that the medical condition could cause him serious injury or death.

35.     Following Mr. Simoens' initial statement of his need for immediate and ongoing medical treatment, none of the on-duty Defendants took any action to provide medical treatment to Mr. Simoens, including but not limited to failing to provide him with an examination by qualified medical personnel, or allow him to call home or his physician to arrange to have his medications delivered to the jail.

36.     During the three days that Mr. Simoens was in the jail, his symptoms progressed from mild epigastric discomfort to more severe epigastric pain, eventually leading to  bilious vomiting, and then as the gastric acid eroded into his visceral blood supply, the vomiting of frank blood, and ultimately the vomiting of hemorrhagic blood.

– 9 –

37.     One or more or all of the on-duty Defendants knew, or should have known, or in the exercise of reasonable care could have known, of the gradual deterioration of Mr. Simoens' medical condition over the three days of detention, as described in Paragraph 36 above. Despite this knowledge, none of the on-duty Defendants took any action to provide medical treatment for Mr. Simoens prior to his collapse on September 9, 2007.

38.     The on-duty Defendant(s) who had the duty to clean Mr. Simoens' cell after any vomiting episode, and who did so, knew of Mr. Simoens' condition, and failed to take any action to obtain medical treatment for him, either on their own, or by reporting his condition to a higher-ranking person on duty and requesting such medical attention.

39.     During the three days Mr. Simoens was in the jail, Mr. Simoens repeatedly informed one or more of the on-duty Defendants of his increasing need for medical attention and the severity of his medical condition. Until Mr. Simoens' collapse on September 9, 2007, no one provided him with any medical treatment in response to these requests.

40.     During the three days Mr. Simoens was in the jail, one or more other detainees observed Mr. Simoens' condition and reported that condition to one or more of the on-duty Defendants. None of the on-duty Defendants to whom the detainees made these reports of Mr. Simoens' need for medical treatment: (a) acted personally to ensure that Mr. Simoens received medical treatment, or (b) reported his condition to a higher-ranking person on duty and requested medical attention on Mr. Simoens' behalf, or (c) reported his condition to the next shift of personnel on duty at the jail, or (d) reported his condition to anyone else up the OPD chain of command for the jail.

41.     None of the on-duty Defendants who were directly informed by Mr. Simoens of his increasingly severe medical condition, or directly informed of his condition by another

– 10 –

detainee, or who knew of his condition by observation, took any steps to provide medical attention to Mr. Simoens; to advise any co-worker of Mr. Simoens' need for medical attention; to advise either the supervisor on duty or Mr. Benak of Mr. Simoens' need for medical attention, or to advise the Chief of Police or any other responsible person in the OPD chain of command but not on duty of Mr. Simoens' medical condition and/or Mr. Simoens' need for medical treatment and/or the failure of any of the on-duty Defendants to take action to provide medical treatment for Mr. Simoens.

42.     During the three days Mr. Simoens was detained in the jail, Mr. Simoens was not personally observed by one or more on-duty Defendants on a sufficiently frequent basis so as to see the readily-observable signs of his deteriorating condition, or alternatively, he was observed, but his condition was ignored.

43.     No accurate records of Mr. Simoens' medical condition were created or maintained by the on-duty Defendants during the three days Mr. Simoens was detained in the jail.

44.     There was no adequate and accurate communication of information about Mr. Simoens, including but not limited to information about his health or medical condition, between shifts.

45.     During the three days Mr. Simoens was detained in the jail, no on-duty Defendant affirmatively acted to check Mr. Simoens' medical condition, or if an affirmative check of Mr. Simoens' physical condition was made, no one took any steps to ensure the health and well-being of Mr. Simoens.

46.     None of the on-duty Defendants ensured that Mr. Simoens received prompt medical attention after the various subjective and objective indications he was ill, including but

– 11 –

not limited to, after he first requested medical treatment at the time of admission or shortly there-
after,   nor when he was laying on the floor in a fetal position moaning in agony, nor after he
began screaming in pain and begging for medical attention, nor even after the multiple vomiting
incidents.

47.     One or more of the on-duty Defendants became angry with Mr. Simoens'
repeated pleas for medical attention and became verbally and physically abusive to Mr. Simoens.
The verbal abuse included but was not limited to yelling at Mr. Simoens, and telling him to spit
his blood in a milk container.  The physical abuse included, but was not limited to throwing the
milk container at Mr. Simoens, and at one point slamming closed an opening in the door to the
cell occupied by Mr. Simoens and other detainees, in an effort to muffle his pleas for help, and
shelter themselves from the sounds and smells of the vomiting.

48.     One or more of the on-duty Defendants caused Mr. Simoens to be moved to a
solitary cell, thereby isolating him and reducing the potential for close observation of Mr.
Simoens and his condition by another detainee.

49.     Mr. Simoens asked one of the on-duty Defendants, whose identity is not
presently known to Plaintiffs, whether a bond had been posted yet, so that he could get out of the
jail and go to a hospital, or alternatively he asked for permission to use the telephone to contact
someone to arrange to have bail posted for him, and he was either falsely told that no bond had
been posted when in fact one had, or alternatively, was falsely told that he could not post a bond
and would be held until Monday, September 10, 2007.

50.     On the evening of September 9, 2007, Mr. Simoens, who at the time was
hemorrhaging blood from his stomach, made final pleas for medical treatment to one or more of
the on-duty Defendants, and Mr. Simoens told such person(s) that he thought he was going to

– 12 –

die. The response from the on-duty Defendant was: "Go ahead, lay down and fucking die."

51.     Mr. Simoens finally collapsed and lost consciousness Sunday night, September 9, 2007. Only then was emergency medical help summoned by one or more of the on-duty Defendants.

52.     Mr. Simoens was transferred by ambulance to Creighton University Medical Center where he died on September 11, 2007, with members of his family at his bedside. The cause of death appeared to be gastrointestinal hemorrhage and perforation of a chronic ulcer. This was the same ulcer for which he had been taking medications prior to his detention, and the same ulcer about which he had been complaining for three days.

53.     In 1998, Douglas County retained the Institute for Law and Policy Planning, of Berkeley, California, to study the operations of the Douglas County Jail and the City jail, and to make recommendations on improvements. The Institute's report described the City jail as a "liability waiting to happen," and recommended the consolidation of the City's and County's booking facilities by building a new facility.

54.     Thereafter, the taxpayers approved a $40,000,000 bond issue to implement the recommendation. Despite having been informed that the jail was a liability waiting to happen, the City Council, acting on behalf of the City, chose to take no action on the bond issue as it wanted to appropriate money to other projects.

55.     After the present mayor of the City, Mike Fahey, took office in 2001 the City and County discussed the consolidation of the two jails, but nothing came of the 2002 discussions. Again, the City Council chose to appropriate money for other projects.

56.     Only after the death of Mr. Simoens did the City finally begin active negotiations with Douglas County on closing the City jail and consolidating booking with the

– 13 –

County.  Shortly before the filing of this Complaint, and only three months after the death of Mr. Simoens, the City and County publicly stated that they are nearing an agreement on accomplishing the consolidation that had been recommended in 1998—one decade ago.

57.     Following the death of Mr. Simoens, several admissions were publicly made by the City and the OPD, including but not limited to:

a.     Thomas Warren, the now-former Chief of Police admitted there were staffing problems at the jail;

b.     Paul Landrow, Chief of Staff for Mayor Fahey, admitted that Ms. Moore, who was a supervisor at the jail, "knew that Mr. Simoens was ill, and she did not act appropriately to take care of him;"

c.     Thomas Warren, the now-former Chief of Police admitted that Mr. Simoens had been neglected;

d.     Thomas Warren, the now-former Chief of Police admitted that there was a breakdown in communications between two shifts at the jail and that there was insufficient documentation of Mr. Simoens' physical problems, and

e.     Mr. Landow admitted that he was not surprised by the grand jury's findings.

58.     Medical personnel at the Creighton University Medical Center advised Mr. Simoens' family that if he had received treatment sooner or been brought to the hospital sooner he would not have died.

59.     On December 20, 2007, a grand jury issued misdemeanor indictments against Mr. Dankiw, Ms. Moore, Mr. Freeman and Mr. Haefele, charging them with violating Nebraska Jail Standards, Title 81, Chapter 10, §§ 1 and 2, and Chapter 2, § 5.

60.     On December 20, 2007, the grand jury made the following findings:

– 14 –

a.      The guidelines of the City Jail irresponsibly allowed people to be held at the jail without on-site, licensed, medically trained personnel;

b.      Current training for jail personnel was inadequate to provide the skills, knowledge and expertise required or necessary to meet basic human needs;

c.      The jail Standard Operating Policy Manual is unclear, poorly defined and lacks specific instructions;

d.      Many employees of the jail are not actively practicing the standards, and consequences or repercussions for violations are not enforced;

e.      The jail is not properly staffed because of budget restrictions, and

f.      The staff to inmate ratio is inadequate, and more than fifty inmates to three to four jail staff is appalling.

61.     As a direct and proximate result of the conduct described above, and the intentional and/or negligent acts and/or omissions described in Part 3 below, in the time frame between Mr. Simoens' arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish. Defendants' conduct was clearly motivated by evil intent. Their callous disregard for Mr. Simoens during the three days of his detention was cold, calculated, malicious, and intentionally reckless, constituting willful and wanton behavior which inflicted pain repugnant to the conscience of mankind and human decency. Defendants' conduct caused Mr. Simoens an incomprehensible degree of physical, emotional and mental agony both at the jail and through his death, to such an extent that Defendants' conduct can only be described as torture.

62.     But for the intentional and/or negligent conduct of Defendants, as described in

– 15 –

this Complaint, Mr. Simoens would not have died, nor would he have suffered in agony for days.

63.     The conduct of Defendants, whether intentional or negligent, was careless, callous, unreasonable, excessive, willful, wanton, arbitrary, capricious, oppressive, and without justification or excuse. Defendants' conduct created an unnecessary risk of harm to Mr. Simoens which directly led to his death. Defendants' conduct was outrageous, and a gross abuse of governmental power over detainees in the City jail, as well as demonstrating an unconscionable and reckless disregard of Mr. Simoens' constitutional rights, and his basic human dignity. The aggregate conduct of Defendants shocks the conscience of any reasonable person.

### PART 3: CLAIMS

### Count I
### (42 U.S.C. §1983, Fifth, Eighth and Fourteenth Amendments,
### Against the Individual Defendants)

For their Count I claim against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25 ("the individual defendants"), Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

64.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 62.

65.     The individual Defendants intentionally or negligently:

a.     Failed to know and understand the medical rights of detainees in the jail, relating to providing prompt and adequate medical treatment to detainees;

b.     Routinely ignored the medical needs of detainees over a substantial period of time, without adverse consequences for doing so;

c.    Failed to perform any pre-admission medical screening of Mr. Simoens, or if one was performed it was done in a grossly inadequate manner;

d.    Failed to perform any prompt post-admission medical screening, as an alternative to a pre-admission screening, or if one was performed it was done in a grossly inadequate manner;

e.    Failed to adequately communicate detainees' medical condition between shifts on an ongoing and long-term basis, including but not limited to Mr. Simoens;

f.    On an ongoing and long-term basis, failed to properly observe detainees on any kind of minimum regular basis, or more frequently as particular circumstances may have necessitated, including but not limited to Mr. Simoens;

g.    Ignored Mr. Simoens' repeated requests for help and medical attention;

h.    Verbally abused Mr. Simoens, including but not limited to the "spit blood" remark and the "lay down and fucking die" remarks;

i.    Physically abused Mr. Simoens, including but not limited to the milk carton incident, putting him into solitary confinement and ensuring that he could not be heard, or was highly unlikely to be heard, either being ill or pleading for medical help;

j.    Engaged in a long-term and ongoing custom and practice of disregarding the medical needs of detainees, in whole or in part because of the adverse effect on the jail's budget as a result of actually providing medical care;

k.    Failed to adequately document Mr. Simoens' condition;

l.    Failed to recognize and respond in a timely manner to Mr. Simoens' medical problems;

m.    Allowed Mr. Simoens' medical condition to deteriorate to the point of collapse and imminent death, followed by death;

n.    Failed to call for a physician to examine Mr. Simoens prior to admission or immediately thereafter when Mr. Simoens stated he had a medical problem which required medication;

o.    Failed to provide an examination and treatment by a physician or other qualified, licensed health professional the first time Mr. Simoens asked for help;

p.    Failed to provide an examination and treatment by a physician or other qualified, licensed health professional each and every time thereafter that Mr. Simoens asked for help;

q.    Failed to provide an examination and treatment by a physician or other qualified, licensed health professional the first time Mr. Simoens vomited;

r.    Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited;

s.    Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited blood;

t.    Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited blood;

u.    Failed to personally observe Mr. Simoens with sufficient regularity so as to be able to observe and respond to his medical needs in a timely manner;

v.    On an ongoing and long-term basis, failed to conduct at least once a day "medical inspections" of detainees, including but not limited to Mr. Simoens, by personally questioning detainees about their health and medical condition;

w.       Failed to properly document once-a-day "medical inspections," if any such inspections were made;

x.       Failed to recognize and understand that vomiting without blood is a known sign of potential internal bleeding requiring medical attention;

y.       Failed to recognize and understanding that vomiting blood is an even stronger indication of potential internal bleeding with an even higher degree of necessity for medical attention, and

z.       Failed to know and understand the nature and extent of Mr. Simoens' constitutional right as a pretrial detainee to adequate medical attention, and to act in conformance with the constitutional standards.

66.      The individual defendants, by the above-described acts and omissions, whether intentional or negligent, willfully and wantonly ignored the obvious serious medical needs of Mr. Simoens; ignored the patent, substantial risk of either serious injury to Mr. Simoens or his death, and combined with their failure to take any steps to provide him with prompt and adequate medical attention to which he was entitled under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, thereby demonstrated deliberate indifference to Mr. Simoens' medical needs, in violation of Mr. Simoens' established constitutional rights

67.      As a direct and proximate result of these violations of Mr. Simoens' constitutional rights, Mr. Simoens suffered the injuries described in Paragraph 61 above.

68.      As a direct and proximate result of these violations of Mr. Simoens' constitutional rights, and according to United States Government Life Expectancy Tables, Mr. Simoens died 31.1 years premature on September 11, 2007.

69.      The above-described conduct of the individual defendants was motivated by an

evil motive or intent or by a reckless or callous indifference to the federally protected rights of Mr. Simoens, so that Plaintiffs are entitled to recovery of punitive damages from these Defendants.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for an individual award of punitive damages against each Defendant in an amount sufficient to punish each Defendant and to deter others from like conduct; for attorney fees according to law; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count II
### (§1983 [Monell Action] Against Institutional and Official Defendants for failure to properly instruct, train, supervise and provide adequate medical care)

For their Count II claim against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; Charles Benak; the Chief of Police of the City of Omaha; Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson; Chuck Sigerson, Jr.; Thomas Warren; the City of Omaha; the Omaha Police Department; the City Council; John and Jane Does 1-14, and John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the adopted daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

70.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 63.

71.     Mr. Dankiw; Ms. Moore; Mr. Freeman; Mr. Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, acting in their official capacities, intentionally or negligently:

– 20 –

a.   Failed to know and understand the constitutional rights of detainees, including Mr. Simoens, relating to their medical needs and to providing prompt and adequate medical treatment to detainees;

b.   Routinely ignored the medical needs of detainees over a substantial period of time, without adverse consequences for doing so;

c.   Failed to perform any pre-admission medical screening of Mr. Simoens, or if one was performed it was done in a grossly inadequate manner;

d.   Failed to perform any prompt post-admission medical screening, as an alternative to a pre-admission screening, or if one was performed it was done in a grossly inadequate manner.

e.   Failed to adequately communicate detainees' medical condition between shifts on an ongoing and long-term basis, including but not limited to Mr. Simoens;

f.   On an ongoing and long-term basis, failed to properly observe detainees on the schedule required by law, or more frequently as particular circumstances may have necessitated, including but not limited to Mr. Simoens;

g.   Ignored Mr. Simoens' repeated requests for help and medical attention;

h.   Verbal abused Mr. Simoens, including but not limited to the "spit blood" remark and the "lay down and fucking die" remarks;

i.   Physically abused Mr. Simoens, including but not limited to the milk carton incident, putting him into solitary confinement and ensuring that he could not be heard, or was highly unlikely to be heard, either being ill or pleading for medical help;

j.   Engaged in a long-term and ongoing custom and practice of disregarding the

medical needs of detainees, in whole or in part because of the adverse effect on the jail's budget as a result of actually providing medical care;

k.   Failed to adequately document Mr. Simoens' condition;

l.   Failed to recognize and respond in a timely manner to Mr. Simoens' medical problems;

m.   Allowed Mr. Simoens' medical condition to deteriorate to the point of collapse and imminent death, followed by death;

n.   Failed to call for a physician to examine Mr. Simoens prior to admission or immediately thereafter when Mr. Simoens stated he had a medical problem which required medication;

o.   Failed to provide an examination and treatment by a physician the first time Mr. Simoens asked for help;

p.   Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens asked for help;

q.   Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited;

r.   Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited;

s.   Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited blood;

t.   Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited blood;

s.   Failed to follow any guidelines that might have existed at the time of the events

giving rise to this litigation, in the jail's operation and procedure manual (or any other document providing that function, regardless of its name) relating to meeting the medical needs of detainees, including but not limited to Mr. Simoens;

t.　　Failed to regularly personally observe Mr. Simoens and other detainees with sufficient frequency to enable jail personnel to promptly detect and meet the medical needs of detainees, including Mr. Simoens;

u.　　On an ongoing and long-term basis, failed to conduct once a day "medical inspections" of detainees, including but not limited to Mr. Simoens, by personally questioning detainees about their health and medical condition;

v.　　Failed to properly document the once-a-day "medical inspections;"

w.　　Failed to recognize and understand that vomiting without blood is a known sign of potential internal bleeding requiring medical attention;

x.　　Failed to recognize and understanding that vomiting blood is an even stronger indication of potential internal bleeding with an even higher degree of necessity for medical attention, and

y.　　Failed to know and understand the nature and extent of Mr. Simoens' constitutional right as a pretrial detainee to adequate medical attention, and to act in conformance with the constitutional standards.

72.　　The violations of Mr. Simoens' constitutional rights as described in Part 2 and Count I, above, were caused in whole or in part by the customs, policies, and practices of the institutional and official defendants, as promulgated, disseminated, and enforced by the official defendants, so that the institutions and official defendants charged with ensuring adequate health

– 23 –

care to pretrial detainees at the jail, completely failed to provide access to the most basic medical care and treatment commensurate with the standards and principles of a civilized society, both with reference to Mr. Simoens and to other detainees at the jail before September 7, 2007, and to previous detainees over a substantial period of time.

73.    The failures of the institutional and official defendants (excluding those Defendants identified in Paragraph 71 above) include, but are not limited to the following customs and policies:

a.    Fostering or promoting the establishment and long-term continuation of an atmosphere or work environment at the jail where detention and medical personnel (if any) were encouraged to disregard the serious medical needs of detainees, in whole or in part because of the adverse financial consequences to the budget allocated to the jail if there were multiple events of providing potentially expensive health care services during any one fiscal year;

b.    Failing to ensure that emergency medical treatment of detainees could be accomplished in a reasonable time frame;

c.    Failing to provide on-site, licensed medical personnel, or at a minimum on-site personnel with sufficient medical training to recognize the need for medical treatment for a detainee, and provide those persons with sufficient authority to ensure that physicians or other appropriate health care providers were available on both a non-emergency and emergency basis;

d.    Failing to prepare, distribute and enforce an adequate plan to respond to both non-emergency and emergency medical needs of detainees, including but not limited to Mr. Simoens;

– 24 –

e.   Failing to provide a reasonably equipped, reasonably staffed emergency medical response team;

f.   Failing to establish and enforce a clear system that would enable the medical requests of detainees, including the multiple requests of Mr. Simoens here, to be promptly reviewed by medically-trained medical personnel and acted upon in a reasonable manner consistent with the requirements of the Constitution;

g.   Allowing the jail to be seriously and grossly understaffed, despite knowing that understaffing significantly increases the risk of harm to detainees, including but not limited to the likelihood that detainees' serious medical needs, including those of Mr. Simoens, would go untreated;

h.   Failing to create and enforce a system of pre-admission medical screening by appropriately trained and/or licensed medical personnel;

i.   Failing to adequately train City or OPD employees assigned to work in the jail, with particular reference to recognizing the serious medical needs of detainees and the obligation to provide them, including Mr. Simoens, with prompt medical attention;

j.   Failing to adequately supervise and train jail employees to ensure that the constitutional standards for meeting the serious medical needs of detainees, including Mr. Simoens, are met;

k.   Retaining employees such as Mr. Dankiw; Ms. Moore; Mr. Freeman and Mr. Haefele, and others of like work history, knowing of the likelihood they would engage in the conduct described above which led to Mr. Simoens' five days of agony and his death;

l.      Failing to create and enforce a system to ensure adequate communications between shifts at the jail concerning the individual detainees, both generally and with particular reference to the medical condition or status of detainees, including Mr. Simoens;

m.      Failing to create and enforce a methodology of systematic and documented personal observation of all detainees, twenty-four hours a day, on a sufficiently regular basis so as to ensure prompt recognition of a detainee's medical needs and equally prompt meeting of those needs;

n.      Failing to create and enforce a system to prevent verbal abuse of detainees, including Mr. Simoens;

o.      Failing to create and enforce a system to prevent physical abuse of detainees, including Mr. Simoens;

p.      Allowing the creation and long-term existence of the practice of disregarding the serious medical needs of detainees;

q.      Failing to create and enforce a constitutionally adequate system to obtain prompt medical treatment for a detainee when he shows physical signs of a serious medical need, including but not limited to Mr. Simoens lying in the fetal position on the floor of his cell, moaning in agony; his repeated pleas for medical attention, and his vomiting both gastric contents and ultimately blood;

r.      Failing to create and enforce a constitutionally adequate system to obtain prompt medical treatment for a detainee who requests such assistance and provides a verbal explanation of symptoms, such as Mr. Simoens did, that would lead a reasonable person to conclude Mr. Simoens had serious medical needs;

s.     Failing to provide adequate training for jail employees with reference to the nature and extent of the constitutional requirements for meeting the medical needs of detainees, and in how to comply with those standards;

t.     Failing to ensure adequate supervision of jail employees, including those on duty during the approximate three days Mr. Simoens was detained at the jail, to ensure that the constitutional standards for meeting the serious medical needs of detainees are met;

u.     Failing to establish and enforce a system of annual continuing education in jail operations, including but not limited to initial or refresher courses in meeting the serious medical needs of detainees;

v.     Failing to train jail employees to recognize the signs of actual or potential internal bleeding, including but not limited to vomiting, and/or vomiting that included blood;

w.     Failing to have and/or enforce a written policy, procedure and practice that all medical matters involving or requiring medical judgment are the sole province of the jail's responsible physician;

x.     Failing to have and/or enforce a written policy, procedure and practice that inmates' health complaints are solicited daily, acted on by health-trained detention personnel, and followed by appropriate triage and treatment by qualified health professionals;

y.     Failing to have and/or enforce a written policy, procedure and practice that on the arrival at the jail a medical screening is performed by health-trained or qualified health care professionals on all inmates, with the screening including,

– 27 –

but not being limited to, inquiries into a detainee's current illness and health problems; use of medications; health problems diagnosed by the detainee's physician; and appropriate observation of the detainee's person and conduct, and

z.        Failing to have and/or enforce a written policy, procedure and practice that detention and other personnel are trained to respond to health-related situations within a very short time frame, with the training program being developed by the jail's responsible health authority in cooperation with the administrator/manager/supervisor of the jail, and including, but not being limited to, recognition of signs and symptoms and knowledge of the actions to be taken in emergency, including signs and symptoms of internal bleeding.

74.      The above-described acts and omissions of Mr. Dankiw; Ms. Moore; Mr. Freeman, Mr. Haefele, and Jane and John Does 1-25, in their official capacities occurred as the direct result of the policies, customs, practices and procedures created or ratified or tacitly approved by Defendant City Council members, the City Council, the Chief of Police, the City, and/or the OPD, and Mr. Warren (the former Chief of Police), and/or Mr. Benak, in their policy-making and/or supervisory official capacities. This conduct, in the aggregate, amounted to deliberate indifference not only to Mr. Simoens' right to adequate medical attention, but to the similar rights of other detainees over a substantial period of time.

75.      The above-described conduct of Defendants who acted in supervisory official capacities over the jail created the customs or policies under which the above-described unconstitutional practices occurred, or allowed such policies to continue.

76.      The Defendants who acted in a supervisory official capacity over the jail were grossly negligent in managing the subordinates, *i.e.*, Defendants Dankiw, Moore, Freeman,

Haefele, and Jane and John Does 1-24, who caused the unlawful events which occurred between September 7, 2007, and September 9, 2007.

77.     The institutional and official Defendants clearly violated the established constitutional rights of Mr. Simoens, of which a reasonable person would have known.

78.     As a direct and proximate result of the above-described violations of Mr. Simoens' constitutional rights, Mr. Simoens suffered the injuries described in Paragraph 60 above.

79.     As a direct and proximate result of the above-described violations of Mr. Simoens' constitutional rights, Mr. Simoens died on September 11, 2007.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; Charles Benak; the Chief of Police of the City of Omaha; Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson; Chuck Sigerson, Jr.; Thomas Warren; the City of Omaha; the Omaha Police Department; the City Council; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in the amount that is fair and reasonable; for attorney fees according to law; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

Date: January 11, 2008

/s/ Joseph P. Cullan
Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576
Cullan & Cullan , LLC
1113 Harney Street
Omaha, NE  68102

Telephone:  (402) 397-7600
Fax:  (402) 397-3816
Email:
  joe@cullanlaw.com
  pat@cullanlaw.com

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

/s/ Joseph P. Cullan
Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576
Cullan & Cullan , LLC
1113 Harney Street
Omaha, NE  68102

Telephone:  (402) 397-7600
Fax:  (402) 397-3816
Email:
  joe@cullanlaw.com
  pat@cullanlaw.com

Attorneys for Plaintiffs

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby designate Omaha as the place of trial.

/s/ Joseph P. Cullan
Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576
Cullan & Cullan , LLC
1113 Harney Street
Omaha, NE 68102

Telephone: (402) 397-7600
Fax: (402) 397-3816
Email:
  joe@cullanlaw.com
  pat@cullanlaw.com

Attorneys for Plaintiffs

| STATE OF NEBRASKA | Co-<br>**LETTERS OF PERSONAL REPRESENTATIVE** | Doc. PR-07-1632 |
|---|---|---|
| 11 (10/92) | | Page _____ |

**Douglas County Court, Probate Division**
**17th & Farnam Streets, 3-West, Omaha, NE 68183 (402) 444-7152**

IN THE MATTER OF THE
ESTATE OF

Alexander T. Simoens
(Deceased)

TO:   Elizabeth Higgins & Shawn Simoens

WHEREAS, __Alexander T. Simoens__ died on

__September 11__, 2007 and on __November 6__, 2007, you were

appointed and have qualified as __Co-Personal Representative's__ of the estate

of the above named decedent by the __Division Manager__ of this Court

NOW, THEREFORE, your appointment is hereby confirmed, and this letter of personal representative is

issued as evidence of such appointment and qualification and authority of said _____

Elizabeth Higgins & Shawn Simoens

to do and perform all acts which may be authorized or required by law. You are required to file an inventory within

90 days after your appointment. Limitation(s) of powers specified by will or Court order as of the date of

certification of this letter, are as follows:

ISSUED 11/09/2007   BY THE COURT: *John A. Daylord*   XXXXXXXXXXXXXXXXXX
Division Manager   (County Judge/Clerk Magistrate)

COURT
PRECISION

NOV - 9 2007

DOUGLAS COURT