## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**ELIZABETH HIGGINS** and
**SHAWN SIMOENS**, as co-Personal
Representatives of the Estate of
Alexander T. Simoens; and
**ELIZABETH HIGGINS** and
**SHAWN SIMOENS**, daughter and son
Alexander T. Simoens, deceased,

        Plaintiffs,

    *vs.*

**JOACHIM DANKIW;**
**JEANELLE MOORE;**
**ANDREW FREEMAN;**
**MARK HAEFELE;**
**CHARLES BENAK;**
**JIM SUTTLE;**
**FRANK BROWN;**
**JIM VOKAL;**
**GARRY GERNANDT;**
**DAN WELCH;**
**FRANKLIN THOMPSON;**
**CHUCK SIGERSON, JR.;**
**THOMAS WARREN;**
**THE CITY OF OMAHA;**
**JOHN AND JANE DOES 1-14**
(agents, servants and employees of
the City who were on duty at the
City jail from September 7, 2007,
through September 9, 2007, and
whose real names are unknown) and
**JOHN AND JANE DOES 15-25**
(agents, servants and employees of
the City who were on duty at the
City jail from September 7, 2007,
through September 9, 2007, and
whose real names are unknown),

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FIRST AMENDED COMPLAINT FOR
MONETARY DAMAGES UNDER 42
U.S.C. § 1983, AND STATE TORT
CLAIMS PURSUANT TO §13-901,
*et seq.*, Neb. Rev. Stat.

DEMAND FOR JURY TRIAL
ON ALL ISSUES TRIABLE
BY A JURY

No. 8:08CV015

| | | | |
|---|---|---|---|
| | IX | Defendant City of Omaha (wrongful death for failing to adopt and enforce adequate policies to ensure Mr. Simoens received adequate and timely healthcare, and to ensure the jail was sufficiently staffed on all shifts to meet the healthcare needs of detainees) | 41-46 |
| | X | Defendant City of Omaha (survival action for failing to adopt and enforce adequate policies to ensure Mr. Simoens received adequate and timely healthcare, and to ensure the jail was sufficiently staffed on all shifts to meet the healthcare needs of detainees) | 46 |
| | XI | Defendants Warren, Benak and the Doe Defendants (wrongful death for negligently failing to adequately train and supervise the jail employees) | 47-50 |
| | XII | Defendants Warren, Benak and the Doe Defendants (survival action for negligently failing to adequately train and supervise the jail employees) | 50 |
| | XIII | Defendant Moore (wrongful death for negligently failing to adequately train and supervise the jail employees) | 51-53 |
| | XIV | Defendant Moore (survival action for negligently failing to adequately train and supervise the jail employees) | 54 |
| | XV | Defendants Suttle, Brown, Vokal, Gernandt, Welch, Thompson and Sigerson (wrongful death for negligently failing to adequately train and supervise, or failing to ensure the adequate training and supervision of jail employees so as to ensure Mr. Simoens received adequate and timely healthcare) | 54-57 |
| | XVI | Defendants Suttle, Brown, Vokal, Gernandt, Welch, Thompson and Sigerson (survival action for negligently failing to adequately train and supervise, or failing to ensure the adequate training and supervision of jail employees so as to ensure Mr. Simoens received adequate and timely healthcare) | 57-59 |
| Prayer for Relief | | Count I: Compensatory damages in an amount that is fair and reasonable, and individual awards of punitive damages against each Defendant | 17 |
| Prayer for Relief | | Count II: Compensatory damages in an amount that is fair and reasonable | 24 |
| Prayer for Relief | | Count III: Compensatory damages in an amount that is fair and reasonable | 28 |
| Prayer for Relief | | Count IV: Compensatory damages in an amount that is fair and reasonable | 28 |
| Prayer for Relief | | Count V: Compensatory damages in an amount that is fair and reasonable | 34 |
| Prayer for Relief | | Count VI: Compensatory damages in an amount that is fair and reasonable | 34 |
| Prayer for Relief | | Count VII: Compensatory damages in an amount that is fair and reasonable | 40 |

| | | | |
|---|---|---|---|
| Prayer for Relief | | Count VIII: Compensatory damages in an amount that is fair and reasonable | 40-41 |
| Prayer for Relief | | Count IX: Compensatory damages in an amount that is fair and reasonable | 46 |
| Prayer for Relief | | Count X: Compensatory damages in an amount that is fair and reasonable | 46 |
| Prayer for Relief | | Count XI: Compensatory damages in an amount that is fair and reasonable | 50 |
| Prayer for Relief | | Count XII: Compensatory damages in an amount that is fair and reasonable | 50 |
| Prayer for Relief | | Count XIII: Compensatory damages in an amount that is fair and reasonable | 53 |
| Prayer for Relief | | Count XIV: Compensatory damages in an amount that is fair and reasonable | 54 |
| Prayer for Relief | | Count XV: Compensatory damages in an amount that is fair and reasonable | 57 |
| Prayer for Relief | | Count XVI: Compensatory damages in an amount that is fair and reasonable | 58 |
| Jury Demand | | Demand for trial by jury pursuant to Rule 38(a) of the Federal Rules of Civil Procedure | 59 |
| Place of Trial | | Designation of Omaha as the place of trial | 59 |

Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, complaining of Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; Charles Benak; Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson; Chuck Sigerson, Jr.; Thomas Warren; The City of Omaha; John and Jane Does 1-14, and John and Jane Does 15-25, allege:

## PART 1: PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs Elizabeth Higgins and Shawn Simoens are the duly-appointed co-Personal Representatives of the Estate of Alexander T. Simoens, and are bringing suit in that capacity.

2.      Plaintiffs Elizabeth Higgins and Shawn Simoens, in their individual capacities are bringing suit as the daughter and son, and the sole heirs at law, of Alexander T. Simoens, deceased ("Mr. Simoens").

3.      At all times relevant to this litigation, Defendant Joachim Dankiw ("Mr. Dankiw") has been an agent, servant, or employee of Defendant City of Omaha ("the City"), assigned to work for the Omaha Police Department ("the OPD") and/or assigned to work at the City Jail ("the jail"). At all times Mr. Dankiw was acting in the course and scope of his employment or other business relationship with the City, working as a detention technician, or some similar or related job title, at the jail. He is being sued in both his official and individual capacities, and was at all times acting under color of state law. Mr. Dankiw is also being sued individually, pursuant to the Nebraska Political Subdivision Tort Claims Act, §13-901, *et. seq.*, Neb. Rev. Stat. (Hereinafter, "PSTCA.")

5.      At all times relevant to this litigation, Defendant Jeanelle Moore ("Ms. Moore") has been an agent, servant, or employee of the City, assigned to work for the OPD and/or assigned to work at the jail. At all times Ms. Moore was acting in the course and scope of her employment or other business relationship with the City, working as a detention technician, or detention supervisor, or some similar or related job title, at the jail. She is being sued in both her

official and individual capacities, and was at all times acting under color of state law. Ms. Moore is also being sued individually, pursuant to the PSTCA.

6.       At all times relevant to this litigation, Defendant Andrew Freeman ("Mr. Freeman") has been an agent, servant, or employee of the City, assigned to work for the OPD and/or assigned to work at the jail. At all times Mr. Freeman was acting in the course and scope of his employment or other business relationship with the City, working as a detention technician, or some similar or related job title, at the jail. He is being sued in both his official and individual capacities, and was at all times acting under color of state law. Mr. Freeman is also being sued individually, pursuant to the PSTCA.

7.       At all times relevant to this litigation, Defendant Mark Haefele ("Mr. Haefele") has been an agent, servant, or employee of the City, assigned to work for the OPD and/or assigned to work at the jail. At all times Mr. Haefele was acting in the course and scope of his employment or other business relationship with the City, working as a detention technician, or some similar or related job title, at the jail. He is being sued in both his official and individual capacities, and was at all times acting under color of state law. Mr. Haefele is also being sued individually, pursuant to the PSTCA.

8.       At all times relevant to this litigation, Defendant Charles Benak ("Mr. Benak") has been an agent, servant, or employee of the City, assigned to work in a supervisory capacity for the OPD and/or in a supervisory capacity at the jail. At all times Mr. Benak was acting in the course and scope of his employment or other business relationship with the City, working as the over-all supervisor or manager of the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Benak is also being sued individually, pursuant to the PSTCA.

9.       At all times relevant to this litigation, Defendant Jim Suttle ("Mr. Suttle") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Suttle is also being sued individually, pursuant to the PSTCA.

10.       At all times relevant to this litigation, Defendant Frank Brown ("Mr. Brown") has been a member of the City Council of the City of Omaha, acting in the course and scope of

that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Brown is also being sued individually, pursuant to the PSTCA.

11.     At all times relevant to this litigation, Defendant Jim Vokal ("Mr. Vokal") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Vokal is also being sued individually, pursuant to the PSTCA.

12.     At all times relevant to this litigation, Defendant Garry Gernandt ("Mr. Gernandt") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Gernandt is also being sued individually, pursuant to the PSTCA.

13.     At all times relevant to this litigation, Defendant Dan Welch ("Mr. Welch") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Welch is also being sued individually, pursuant to the PSTCA.

14.     At all times relevant to this litigation, Defendant Franklin Thompson ("Mr. Thompson") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Thompson is also being sued individually, pursuant to the PSTCA.

15.     At all times relevant to this litigation, Defendant Chuck Sigerson, Jr., ("Mr. Sigerson") has been a member of the City Council of the City of Omaha, acting in the course and scope of that relationship with the City, the OPD and the jail. He is being sued in his official capacity, and was at all times acting under color of state law. Mr. Sigerson is also being sued individually, pursuant to the PSTCA.

16.     At the time of the events giving rise to this litigation, Defendant Thomas Warren ("Mr. Warren") was an agent, servant, or employee of the City acting in the course and scope of

his employment or other business relationship with the City. At the time of the events giving rise to this litigation, Mr. Warren was the Chief of Police and was the over-all supervisor or manager of the OPD and was the highest-ranking member of the OPD. Mr. Warren is being sued in his official capacity, and was at all times acting under color of state law. Mr. Warren is also being sued individually, pursuant to the PSTCA.

17.     Defendant The City of Omaha ("the City") is a political subdivision of the State of Nebraska, and was at all times acting under color of state law, and is being sued under 42 U.S.C. §1983 (hereinafter, §1983). The City is also being sued pursuant to the PSTCA.

18.     At all times relevant to this litigation, Defendants John and Jane Does 1-14, whose names are presently unknown to Plaintiffs, were agents, servants or employees of the City who were on duty at the Omaha City Jail from the time Mr. Simoens arrived at the jail on September 7, 2007, through the time at which Mr. Simoens was transferred by ambulance from the jail to Creighton University Medical Center on September 9, 2007. At all times Jane and John Doe Defendants 1-14 were acting in the course and scope of their employment or other business relationship with the City. One or more of them were acting in a supervisory capacity. They are being sued in their official and individual capacities, and were at all times acting under color of state law. They are also being sued individually, pursuant to the PSTCA.

19.     At all times relevant to this litigation, Defendants John and Jane Does 15-25, whose names are presently unknown to Plaintiffs, were agents, servants or employees of the City between the time Mr. Simoens arrived at the jail on September 7, 2007, through the time at which Mr. Simoens was transferred by ambulance from the jail to Creighton University Medical Center on September 9, 2007, who had knowledge during that time frame, or who should or could have had knowledge during that time frame, of the events giving rise to this litigation (as described in Part 2 below), regardless of whether any or all of them were technically on duty at the time. At all times Jane and John Doe Defendants 14-25 were acting in the course and scope of their employment or other business relationship with the City. They are being sued in their official and individual capacities, and were at all times acting under color of state law. They are also being sued individually, pursuant to the PSTCA. Hereinafter, John and Jane Does 1-25; Mr. Dankiw; Ms. Moore, Mr. Freeman and Mr. Haefele will be collectively referred to as "the on-duty Defendants" or "the Doe Defendants."

-4-

20. This Court has original jurisdiction as this suit is being brought pursuant to 42 U.S.C. §1983, and the suit alleges violations of Mr. Simoens' rights under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

21. This Court has supplemental jurisdiction over the claims filed under the PSTCA, pursuant to 28 U.S.C. §1367(a), in that the state law claims made in Part 4 below are so related to the §1983 claims over which this Court has original jurisdiction, that the state law claims form part of the same case or controversy under Article III of the Constitution of the United States.

22. In this Complaint, Defendants in the §1983 claims fall into three groups and may from time to time be collectively referred to by the applicable group identifications:

   a. Institutional Defendant: The City;

   b. Official Defendants: The seven members of the City Council; Mr. Warren; Mr. Benak; Mr. Dankiw; Ms. Moore; Mr. Freeman; Mr. Haefele, and John and Jane Does 1-25, and

   c. Individual Defendants: Mr. Dankiw; Ms. Moore; Mr. Freeman; Mr. Haefele, and John and Jane Does 1-14, and John and Jane Does 15-25.

23. Venue in this Court is proper pursuant to 28 U.S.C. §1391(a) in that the events giving rise to this action occurred within this judicial district and specifically in the City of Omaha, in Douglas County.

### PART 2: GENERAL ALLEGATIONS
### APPLICABLE TO ALL DEFENDANTS
### EXCEPT AS OTHERWISE SPECIFIED BELOW

24. On or about September 7, 2007, at approximately 8:10 p.m., officers of the Omaha Police Department arrested Mr. Simoens for various traffic violations. The officers were acting within the course and scope of their employment by the City.

25. Mr. Simoens was then transported to the Omaha City Jail ("the jail"), where he was booked and detained.

26. At the time Mr. Simoens arrived at the jail he had a pre-existing ulcerous medical condition. Mr. Simoens was aware that failure to treat this condition in a timely and proper manner could have serious and potentially lethal consequences for him. Mr. Simoens had also been informed by one of more of his health care providers that over-the-counter medications

would generally be able to control or relieve any symptoms relating to his ulcer, such as gastrointestinal pain, if promptly taken.

27. As a pretrial detainee at the jail, under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, Mr. Simoens had the following minimum constitutional rights:

a. Timely, adequate and appropriate medical care;

b. To be personally observed during his detention in the jail with sufficient frequency so that any observable change in his physical or medical condition could be seen;

b. To have jail employees stationed adjacent to the area where he was held, in sufficiently close proximity for the jail employee to hear and promptly respond to his calls for medical help, or to have some other method that enabled jail employees to hear his calls for medical help other than waiting for a jail employee to make the rounds;

c. To have a pre-admission medical screening, or alternatively a post-admission medical screening shortly after admission to the jail, with the screening to be conducted by a jail employee trained for that purpose, and trained to determine if immediate medical attention is needed for the detainee;

d. To have accurate records of his health and medical condition maintained, and the information in them accurately conveyed to each succeeding shift;

e. To be detained in a healthful environment with access to adequate medical care;

f. To have proper medical attention provided as soon as possible after any indication that he was ill, and

g. To have jail employees, regardless of rank or title, treat him in a professional manner, which would not include verbal, physical or emotional abuse by the jail employee.

28. Prior to Mr. Simoens' admission to the jail, no one conducted a pre-admission medical screening, which should have included, but not have been limited to, inquiries of Mr. Simoens as to any current illness or health problems; any medications he was taking; any special

health requirements he might have had, and any other health problems identified by his physician(s).

29.     After Mr. Simoens' admission to the jail, no one conducted a post-admission medical screening, which should have included, but not have been limited to, inquiries of Mr. Simoens as to any current illness or health problems; any medications he was taking; any special health requirements he might have had, and any other health problems identified by his physician(s).

30.     Had a pre-admission or prompt post-admission medical screening occurred, the on-duty Defendants would have learned that Mr. Simoens had a severe ulcer condition which required regular medication, and that the failure to provide such medication could have serious adverse consequences to Mr. Simoens' health.

31.     Alternatively, if any pre-admission or prompt post-admission medical screening was undertaken by one or more on-duty Defendants, the screening was: (a) grossly inadequate in that it failed to elicit complete and accurate information from Mr. Simoens as to his then-current medical condition, or (b) the screening obtained complete and accurate information, but the screener chose to ignore the information and not have Mr. Simoens examined by a licensed medical professional, or chose not to communicate that information to anyone else on the shift during which Mr. Simoens was admitted or chose not to ensure, or otherwise failed to ensure that the information was conveyed to the next shift.

32.     At or after the time Mr. Simoens was booked and detained at the jail, Mr. Simoens advised the City, through the on-duty Defendants, including but not limited to the booking officer or other employee of the City performing that function on the evening of September 7, 2007, of his need for medical attention; that he had a previous medical condition which could require urgent medical care, including but not limited to medication which he did not have in his possession at the time of his arrest and booking and detention at the jail, and that the medical condition could cause him serious injury or death.

33.     Following Mr. Simoens' initial statement of his need for immediate and ongoing medical treatment, none of the on-duty Defendants took any action to provide medical treatment to Mr. Simoens, including but not limited to failing to provide him with an examination by

-7-

qualified medical personnel, or allow him to call home or his physician to arrange to have his medications delivered to the jail.

34. During the three days that Mr. Simoens was in the jail, his symptoms progressed from mild epigastric discomfort to more severe epigastric pain, eventually leading to bilious vomiting, and then as the gastric acid eroded into his visceral blood supply, the vomiting of frank blood, and ultimately the vomiting of hemorrhagic blood.

35. One or more or all of the on-duty Defendants knew, or should have known, or in the exercise of reasonable care could have known, of the gradual deterioration of Mr. Simoens' medical condition over the three days of detention, as described above. Despite this knowledge, none of the on-duty Defendants took any action to provide medical treatment for Mr. Simoens prior to his collapse on September 9, 2007.

36. The on-duty Defendant(s) who had the duty to clean Mr. Simoens' cell after any vomiting episode, and who did so, knew of Mr. Simoens' condition, and failed to take any action to obtain medical treatment for him, either on their own, or by reporting his condition to a higher-ranking person on duty and requesting such medical attention.

37. During the three days Mr. Simoens was in the jail, Mr. Simoens repeatedly informed one or more of the on-duty Defendants of his increasing need for medical attention and the severity of his medical condition. Until Mr. Simoens' collapse on September 9, 2007, no one provided him with any medical treatment in response to these requests.

38. During the three days Mr. Simoens was in the jail, one or more other detainees observed Mr. Simoens' condition and reported that condition to one or more of the on-duty Defendants. None of the on-duty Defendants to whom the detainees made these reports of Mr. Simoens' need for medical treatment: (a) acted personally to ensure that Mr. Simoens received medical treatment, or (b) reported his condition to a higher-ranking person on duty and requested medical attention on Mr. Simoens' behalf, or (c) reported his condition to the next shift of personnel on duty at the jail, or (d) reported his condition to anyone else up the chain of command for the jail.

39. None of the on-duty Defendants who were directly informed by Mr. Simoens of his increasingly severe medical condition, or directly informed of his condition by another detainee, or who knew of his condition by observation, took any steps to provide medical

attention to Mr. Simoens; to advise any co-worker of Mr. Simoens' need for medical attention; to advise either the supervisor on duty or Mr. Benak of Mr. Simoens' need for medical attention, or to advise the Chief of Police or any other responsible person in the chain of command but not on duty of Mr. Simoens' medical condition and/or Mr. Simoens' need for medical treatment and/or the failure of any of the on-duty Defendants to take action to provide medical treatment for Mr. Simoens.

     40.     During the three days Mr. Simoens was detained in the jail, Mr. Simoens was not personally observed by one or more on-duty Defendants on a sufficiently frequent basis so as to see the readily-observable signs of his deteriorating condition, or alternatively, he was observed, but his condition was ignored.

     41.     No accurate records of Mr. Simoens' medical condition were created or maintained by the on-duty Defendants during the three days Mr. Simoens was detained in the jail.

     42.     There was no adequate and accurate communication of information about Mr. Simoens, including but not limited to information about his health or medical condition, between shifts.

     43.     During the three days Mr. Simoens was detained in the jail, no on-duty Defendant affirmatively acted to check Mr. Simoens' medical condition, or if an affirmative check of Mr. Simoens' physical condition was made, no one took any steps to ensure the health and well-being of Mr. Simoens.

     44.     None of the on-duty Defendants ensured that Mr. Simoens received prompt medical attention after the various subjective and objective indications he was ill, including but not limited to, after he first requested medical treatment at the time of admission or shortly thereafter, nor when he was laying on the floor in a fetal position moaning in agony, nor after he began screaming in pain and begging for medical attention, nor even after the multiple vomiting incidents.

     45.     One or more of the on-duty Defendants became angry with Mr. Simoens' repeated pleas for medical attention and became verbally and physically abusive to Mr. Simoens. The verbal abuse included but was not limited to yelling at Mr. Simoens, and telling him to spit his blood in a milk container. The physical abuse included, but was not limited to throwing the

milk container at Mr. Simoens, and at one point slamming closed an opening in the door to the cell occupied by Mr. Simoens and other detainees, in an effort to muffle his pleas for help, and shelter themselves from the sounds and smells of the vomiting.

46. One or more of the on-duty Defendants caused Mr. Simoens to be moved to a solitary cell, thereby isolating him and reducing the potential for close observation of Mr. Simoens and his condition by another detainee.

47. Mr. Simoens asked one of the on-duty Defendants, whose identity is not presently known to Plaintiffs, whether a bond had been posted yet, so that he could get out of the jail and go to a hospital, or alternatively he asked for permission to use the telephone to contact someone to arrange to have bail posted for him, and he was either falsely told that no bond had been posted when in fact one had, or alternatively, was falsely told that he could not post a bond and would be held until Monday, September 10, 2007.

48. On the evening of September 9, 2007, Mr. Simoens, who at the time was hemorrhaging blood from his stomach, made final pleas for medical treatment to one or more of the on-duty Defendants, and Mr. Simoens told such person(s) that he thought he was going to die. The response from the on-duty Defendant was: "Go ahead, lay down and fucking die."

49. Mr. Simoens finally collapsed and lost consciousness Sunday night, September 9, 2007. Only then was emergency medical help summoned by one or more of the on-duty Defendants.

50. Mr. Simoens was transferred by ambulance to Creighton University Medical Center where he died on September 11, 2007, with members of his family at his bedside. The cause of death appeared to be gastrointestinal hemorrhage and perforation of a chronic ulcer. This was the same ulcer for which he had been taking medications prior to his detention, and the same ulcer about which he had been complaining for three days.

51. In 1998, Douglas County retained the Institute for Law and Policy Planning, of Berkeley, California, to study the operations of the Douglas County Jail and the City jail, and to make recommendations on improvements. The Institute's report described the City jail as a "liability waiting to happen," and recommended the consolidation of the City's and County's booking facilities by building a new facility.

52.     Thereafter, the taxpayers approved a $40,000,000 bond issue to implement the recommendation. Despite having been informed that the jail was a liability waiting to happen, the City Council, acting on behalf of the City, chose to take no action on the bond issue as it wanted to appropriate money to other projects.

53.     After the present mayor of the City, Mike Fahey, took office in 2001, the City and County discussed the consolidation of the two jails, but nothing came of the 2002 discussions. Again, the City Council chose to appropriate money for other projects.

54.     Only after the death of Mr. Simoens did the City finally begin active negotiations with Douglas County on closing the City jail and consolidating booking with the County. Shortly before the filing of this Complaint, and only three months after the death of Mr. Simoens, the City and County publicly stated that they are nearing an agreement on accomplishing the consolidation that had been recommended in 1998—one decade ago.

55.     Following the death of Mr. Simoens, several admissions were publicly made by the City and the OPD, including but not limited to:

a.      Thomas Warren, the now-former Chief of Police admitted there were staffing problems at the jail;

b.      Paul Landrow, Chief of Staff for Mayor Fahey, admitted that Ms. Moore, who was a supervisor at the jail, "knew that Mr. Simoens was ill, and she did not act appropriately to take care of him;"

c.      Thomas Warren, the now-former Chief of Police admitted that Mr. Simoens had been neglected;

d.      Thomas Warren, the now-former Chief of Police admitted that there was a breakdown in communications between two shifts at the jail and that there was insufficient documentation of Mr. Simoens' physical problems, and

e.      Mr. Landrow admitted that he was not surprised by the grand jury's findings.

56.     If Mr. Simoens had received treatment sooner, or had been brought to the hospital sooner, he would not have died on September 11, 2007.

57.     On December 20, 2007, a grand jury issued misdemeanor indictments against Mr. Dankiw, Ms. Moore, Mr. Freeman and Mr. Haefele, charging them with violating Nebraska Jail Standards, Title 81, Chapter 10, §§ 1 and 2, and Chapter 2, § 5.

58.     On December 20, 2007, the grand jury made the following findings:

a.     The guidelines of the jail irresponsibly allowed people to be held at the jail without on-site, licensed, medically trained personnel;

b.     Current training for jail personnel was inadequate to provide the skills, knowledge and expertise required or necessary to meet basic human needs;

c.     The jail Standard Operating Policy Manual is unclear, poorly defined and lacks specific instructions;

d.     Many employees of the jail are not actively practicing the standards, and consequences or repercussions for violations are not enforced;

e.     The jail is not properly staffed because of budget restrictions, and

f.     The staff to inmate ratio is inadequate, and more than fifty inmates to three to four jail staff is appalling.

59.     As a direct and proximate result of the conduct described above, and the intentional and/or negligent acts and/or omissions described in Parts 3 and 4 below, in the time frame between Mr. Simoens' arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish. Defendants' conduct was clearly motivated by evil intent. Their callous disregard for Mr. Simoens during the three days of his detention was cold, calculated, malicious, and intentionally reckless, constituting willful and wanton behavior which inflicted pain repugnant to the conscience of mankind and human decency. Defendants' conduct caused Mr. Simoens an incomprehensible degree of physical, emotional and mental agony both at the jail and through his death, to such an extent that Defendants' conduct can only be described as torture.

60.     But for the intentional and/or negligent conduct of Defendants, as described in this Complaint, Mr. Simoens would not have died, nor would he have suffered in agony for days.

61.     The conduct of Defendants, whether intentional or negligent, was careless, callous, unreasonable, excessive, willful, wanton, arbitrary, capricious, oppressive, and without justification or excuse. Defendants' conduct created an unnecessary risk of harm to Mr. Simoens which directly led to his death. Defendants' conduct was outrageous, and a gross abuse of governmental power over detainees in the City jail, as well as demonstrating an unconscionable

and reckless disregard of Mr. Simoens' constitutional rights, and his basic human dignity. The aggregate conduct of Defendants shocks the conscience of any reasonable person.

62.     This suit was filed on January 11, 2008. On the same day, Plaintiffs' counsel filed a claim on behalf of Plaintiffs against the City and various employees of the City, pursuant to the PSTCA, by personal delivery of the letter making the claim to Buster Brown, Clerk of the City of Omaha, who is the person designated by the City on its official Web site as the recipient of all claims against the City. A copy of the claim is attached hereto, marked as Exhibit A and incorporated by reference. A copy of the January 11, 2008, claim letter was also filed with the Office of the City Clerk on that day, and a copy was provided to the City Attorney. A copy of the claim letter is attached hereto, marked as Exhibit A and incorporated by reference. *Cf.*, Affidavit of Joseph P. Cullan, attached hereto marked as Exhibit F and incorporated by reference.

63.     The City acknowledged receipt of the January 11, 2008, claim letter on January 14, 2008. A copy is attached hereto, marked as Exhibit B and incorporated by reference.

64.     On May 28, 2008, Plaintiffs' counsel filed a supplemental claim letter, a copy of which is attached hereto, marked as Exhibit C and incorporated by reference.

65.     On May 29, 2008, the City acknowledged receipt of the May 28, 2008, supplemental claim letter and a copy of the acknowledgment is attached hereto, marked as Exhibit D and incorporated by reference.

66.     Neb. Rev. Stat. §13-906 of the PSTCA stayed the filing of any suit arising out of the January 11, 2008, claim for a period of six months, to give the City an opportunity to make a "final disposition" of the claim.

67.     The six-month period under Neb. Rev. Stat. §13-906 expired on or before the close of business on July 14, 2008.

68.     No settlement or other final disposition of the January 11, 2008, claim was made on or before the close of business on July 14, 2008. Cullan Affidavit, Ex. F.

69.     On July 25 2008, Plaintiffs' claim under the PSTCA claim was formally withdrawn, by personal delivery of a withdrawal letter to Buster Brown, by filing a copy with the Office of the Clerk of the City, and by delivery of a copy of the withdrawal letter to City

Attorney Paul Kratz, and to Assistant City Attorney Thomas Mumgaard. A copy of the claim withdrawal letter is attached hereto, marked as Exhibit E and incorporated by reference.

70.     Plaintiffs have complied with all the conditions precedent specified by the PSTCA for the filing of the state law claims in this suit.

### PART 3: §1983 CLAIMS

### Count I
### (42 U.S.C. §1983, Fifth, Eighth and Fourteenth Amendments, Against the Individual Defendants)

For their Count I claim against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25 ("the individual defendants"), Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

71.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 61.

72.     The individual Defendants intentionally or negligently:

a.     Failed to know and understand the medical rights of detainees in the jail, relating to providing prompt and adequate medical treatment to detainees;

b.     Routinely ignored the medical needs of detainees over a substantial period of time, without adverse consequences for doing so;

c.     Failed to perform any pre-admission medical screening of Mr. Simoens, or if one was performed it was done in a grossly inadequate manner;

d.     Failed to perform any prompt post-admission medical screening, as an alternative to a pre-admission screening, or if one was performed it was done in a grossly inadequate manner;

e.     Failed to adequately communicate detainees' medical condition between shifts on an ongoing and long-term basis, including but not limited to Mr. Simoens;

f.     On an ongoing and long-term basis, failed to properly observe detainees on any kind of minimum regular basis, or more frequently as particular circumstances may have necessitated, including but not limited to Mr. Simoens;

-14-

g.	Ignored Mr. Simoens' repeated requests for help and medical attention;

h.	Verbally abused Mr. Simoens, including but not limited to the "spit blood" remark and the "lay down and fucking die" remarks;

i.	Physically abused Mr. Simoens, including but not limited to the milk carton incident, putting him into solitary confinement and ensuring that he could not be heard, or was highly unlikely to be heard, either being ill or pleading for medical help;

j.	Engaged in a long-term and ongoing custom and practice of disregarding the medical needs of detainees, in whole or in part because of the adverse effect on the jail's budget as a result of actually providing medical care;

k.	Failed to adequately document Mr. Simoens' condition;

l.	Failed to recognize and respond in a timely manner to Mr. Simoens' medical problems;

m.	Allowed Mr. Simoens' medical condition to deteriorate to the point of collapse and imminent death, followed by death;

n.	Failed to call for a physician to examine Mr. Simoens prior to admission or immediately thereafter when Mr. Simoens stated he had a medical problem which required medication;

o.	Failed to provide an examination and treatment by a physician or other qualified, licensed health professional the first time Mr. Simoens asked for help;

p.	Failed to provide an examination and treatment by a physician or other qualified, licensed health professional each and every time thereafter that Mr. Simoens asked for help;

q.	Failed to provide an examination and treatment by a physician or other qualified, licensed health professional the first time Mr. Simoens vomited;

r.	Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited;

s.	Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited blood;

t.     Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited blood;

u.     Failed to personally observe Mr. Simoens with sufficient regularity so as to be able to observe and respond to his medical needs in a timely manner;

v.     On an ongoing and long-term basis, failed to conduct at least once a day "medical inspections" of detainees, including but not limited to Mr. Simoens, by personally questioning detainees about their health and medical condition;

w.     Failed to properly document once-a-day "medical inspections," if any such inspections were made;

x.     Failed to recognize and understand that vomiting without blood is a known sign of potential internal bleeding requiring medical attention;

y.     Failed to recognize and understanding that vomiting blood is an even stronger indication of potential internal bleeding with an even higher degree of necessity for medical attention, and

z.     Failed to know and understand the nature and extent of Mr. Simoens' constitutional right as a pretrial detainee to adequate medical attention, and to act in conformance with the constitutional standards.

73.    The individual defendants, by the above-described acts and omissions, whether intentional or negligent, willfully and wantonly ignored the obvious serious medical needs of Mr. Simoens; ignored the patent, substantial risk of either serious injury to Mr. Simoens or his death, and combined with their failure to take any steps to provide him with prompt and adequate medical attention to which he was entitled under the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, thereby demonstrated deliberate indifference to Mr. Simoens' medical needs, in violation of Mr. Simoens' established constitutional rights

74     As a direct and proximate result of these violations of Mr. Simoens' constitutional rights, Mr. Simoens suffered the injuries described in Paragraph 61 above.

75.    As a direct and proximate result of these violations of Mr. Simoens' constitutional rights, and according to United States Government Life Expectancy Tables, Mr. Simoens died 31.1 years premature on September 11, 2007.

76.     The above-described conduct of the individual defendants was motivated by an evil motive or intent or by a reckless or callous indifference to the federally protected rights of Mr. Simoens, so that Plaintiffs are entitled to recovery of punitive damages from these Defendants.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for an individual award of punitive damages against each Defendant in an amount sufficient to punish each Defendant and to deter others from like conduct; for attorney fees according to law; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

**Count II**
**(§1983 [Monell Action] Against Institutional and Official Defendants**
**for failure to properly instruct, train, supervise and provide adequate medical care)**

For their Count II claim against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; Charles Benak; Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson; Chuck Sigerson, Jr.; Thomas Warren; the City of Omaha; John and Jane Does 1-14, and John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the adopted daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

77.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 61.

78.     Mr. Dankiw; Ms. Moore; Mr. Freeman; Mr. Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, acting in their official capacities, intentionally or negligently:

a.     Failed to know and understand the constitutional rights of detainees, including Mr. Simoens, relating to their medical needs and to providing prompt and adequate medical treatment to detainees;

b.     Routinely ignored the medical needs of detainees over a substantial period of time, without adverse consequences for doing so;

c.     Failed to perform any pre-admission medical screening of Mr. Simoens, or if one was performed it was done in a grossly inadequate manner;

d.    Failed to perform any prompt post-admission medical screening, as an alternative to a pre-admission screening, or if one was performed it was done in a grossly inadequate manner.

e.    Failed to adequately communicate detainees' medical condition between shifts on an ongoing and long-term basis, including but not limited to Mr. Simoens;

f.    On an ongoing and long-term basis, failed to properly observe detainees on the schedule required by law, or more frequently as particular circumstances may have necessitated, including but not limited to Mr. Simoens;

g.    Ignored Mr. Simoens' repeated requests for help and medical attention;

h.    Verbally abused Mr. Simoens, including but not limited to the "spit blood" remark and the "lay down and fucking die" remarks;

i.    Physically abused Mr. Simoens, including but not limited to the milk carton incident, putting him into solitary confinement and ensuring that he could not be heard, or was highly unlikely to be heard, either being ill or pleading for medical help;

j.    Engaged in a long-term and ongoing custom and practice of disregarding the medical needs of detainees, in whole or in part because of the adverse effect on the jail's budget as a result of actually providing medical care;

k.    Failed to adequately document Mr. Simoens' condition;

l.    Failed to recognize and respond in a timely manner to Mr. Simoens' medical problems;

m.    Allowed Mr. Simoens' medical condition to deteriorate to the point of collapse and imminent death, followed by death;

n.    Failed to call for a physician to examine Mr. Simoens prior to admission or immediately thereafter when Mr. Simoens stated he had a medical problem which required medication;

o.    Failed to provide an examination and treatment by a physician the first time Mr. Simoens asked for help;

p.    Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens asked for help;

q.    Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited;

r.    Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited;

s.    Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited blood;

t.    Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited blood;

s.    Failed to follow any guidelines that might have existed at the time of the events giving rise to this litigation, in the jail's operation and procedure manual (or any other document providing that function, regardless of its name) relating to meeting the medical needs of detainees, including but not limited to Mr. Simoens;

t.    Failed to regularly personally observe Mr. Simoens and other detainees with sufficient frequency to enable jail personnel to promptly detect and meet the medical needs of detainees, including Mr. Simoens;

u.    On an ongoing and long-term basis, failed to conduct once a day "medical inspections" of detainees, including but not limited to Mr. Simoens, by personally questioning detainees about their health and medical condition;

v.    Failed to properly document the once-a-day "medical inspections;"

w.    Failed to recognize and understand that vomiting without blood is a known sign of potential internal bleeding requiring medical attention;

x.    Failed to recognize and understanding that vomiting blood is an even stronger indication of potential internal bleeding with an even higher degree of necessity for medical attention, and

y.    Failed to know and understand the nature and extent of Mr. Simoens' constitutional right as a pretrial detainee to adequate medical attention, and to act in conformance with the constitutional standards.

79.    The violations of Mr. Simoens' constitutional rights as described herein were caused in whole or in part by the customs, policies, and practices of the institutional and official

defendants, as promulgated, disseminated, and enforced by the official defendants, so that the institutions and official defendants charged with ensuring adequate health care to pretrial detainees at the jail, completely failed to provide access to the most basic medical care and treatment commensurate with the standards and principles of a civilized society, both with reference to Mr. Simoens and to other detainees at the jail before September 7, 2007, and to previous detainees over a substantial period of time.

80. The failures of the institutional and official defendants, *i.e.*, Defendants Moore (in her supervisory capacity), Benak, Suttle, Brown, Vokal, Gernandt, Welch, Thompson, Sigerson, Warren, the City, and those Doe Defendants acting in a supervisory capacity, include, but are not limited to the following customs and policies:

a. Fostering or promoting the establishment and long-term continuation of an atmosphere or work environment at the jail where detention and medical personnel (if any) were encouraged to disregard the serious medical needs of detainees, in whole or in part because of the adverse financial consequences to the budget allocated to the jail if there were multiple events of providing potentially expensive health care services during any one fiscal year;

b. Failing to ensure that emergency medical treatment of detainees could be accomplished in a reasonable time frame;

c. Failing to provide on-site, licensed medical personnel, or at a minimum on-site personnel with sufficient medical training to recognize the need for medical treatment for a detainee, and provide those persons with sufficient authority to ensure that physicians or other appropriate health care providers were available on both a non-emergency and emergency basis;

d. Failing to prepare, distribute and enforce an adequate plan to respond to both non-emergency and emergency medical needs of detainees, including but not limited to Mr. Simoens;

e. Failing to provide a reasonably equipped, reasonably staffed emergency medical response team;

f. Failing to establish and enforce a clear system that would enable the medical requests of detainees, including the multiple requests of Mr. Simoens here, to be

promptly reviewed by medically-trained medical personnel and acted upon in a reasonable manner consistent with the requirements of the Constitution;

g. Allowing the jail to be seriously and grossly understaffed, despite knowing that understaffing significantly increases the risk of harm to detainees, including but not limited to the likelihood that detainees' serious medical needs, including those of Mr. Simoens, would go untreated;

h. Failing to create and enforce a system of pre-admission medical screening by appropriately trained and/or licensed medical personnel;

i. Failing to adequately train City or OPD employees assigned to work in the jail, with particular reference to recognizing the serious medical needs of detainees and the obligation to provide them, including Mr. Simoens, with prompt medical attention;

j. Failing to adequately supervise and train jail employees to ensure that the constitutional standards for meeting the serious medical needs of detainees, including Mr. Simoens, are met;

k. Retaining employees such as Mr. Dankiw; Ms. Moore; Mr. Freeman and Mr. Haefele, and others of like work history, knowing of the likelihood they would engage in the conduct described above which led to Mr. Simoens' five days of agony and his death;

l. Failing to create and enforce a system to ensure adequate communications between shifts at the jail concerning the individual detainees, both generally and with particular reference to the medical condition or status of detainees, including Mr. Simoens;

m. Failing to create and enforce a methodology of systematic and documented personal observation of all detainees, twenty-four hours a day, on a sufficiently regular basis so as to ensure prompt recognition of a detainee's medical needs and equally prompt meeting of those needs;

n. Failing to create and enforce a system to prevent verbal abuse of detainees, including Mr. Simoens;

o.      Failing to create and enforce a system to prevent physical abuse of detainees, including Mr. Simoens;

p.      Allowing the creation and long-term existence of the practice of disregarding the serious medical needs of detainees;

q.      Failing to create and enforce a constitutionally adequate system to obtain prompt medical treatment for a detainee when he shows physical signs of a serious medical need, including but not limited to Mr. Simoens lying in the fetal position on the floor of his cell, moaning in agony; his repeated pleas for medical attention, and his vomiting both gastric contents and ultimately blood;

r.      Failing to create and enforce a constitutionally adequate system to obtain prompt medical treatment for a detainee who requests such assistance and provides a verbal explanation of symptoms, such as Mr. Simoens did, that would lead a reasonable person to conclude Mr. Simoens had serious medical needs;

s.      Failing to provide adequate training for jail employees with reference to the nature and extent of the constitutional requirements for meeting the medical needs of detainees, and in how to comply with those standards;

t.      Failing to ensure adequate supervision of jail employees, including those on duty during the approximate three days Mr. Simoens was detained at the jail, to ensure that the constitutional standards for meeting the serious medical needs of detainees are met;

u.      Failing to establish and enforce a system of annual continuing education in jail operations, including but not limited to initial or refresher courses in meeting the serious medical needs of detainees;

v.      Failing to train jail employees to recognize the signs of actual or potential internal bleeding, including but not limited to vomiting, and/or vomiting that included blood;

w.      Failing to have and/or enforce a written policy, procedure and practice that all medical matters involving or requiring medical judgment are the sole province of the jail's responsible physician;

x.      Failing to have and/or enforce a written policy, procedure and practice that inmates' health complaints are solicited daily, acted on by health-trained detention personnel, and followed by appropriate triage and treatment by qualified health professionals;

y.      Failing to have and/or enforce a written policy, procedure and practice that on the arrival at the jail a medical screening is performed by health-trained or qualified health care professionals on all inmates, with the screening including, but not being limited to, inquiries into a detainee's current illness and health problems; use of medications; health problems diagnosed by the detainee's physician; and appropriate observation of the detainee's person and conduct, and

z.      Failing to have and/or enforce a written policy, procedure and practice that detention and other personnel are trained to respond to health-related situations within a very short time frame, with the training program being developed by the jail's responsible health authority in cooperation with the administrator/manager/supervisor of the jail, and including, but not being limited to, recognition of signs and symptoms and knowledge of the actions to be taken in emergency, including signs and symptoms of internal bleeding.

81.     The above-described acts and omissions of Mr. Dankiw; Ms. Moore; Mr. Freeman, Mr. Haefele, and Jane and John Does 1-25, in their official capacities, occurred as the direct result of the policies, customs, practices and procedures created or ratified or tacitly approved by Defendant City Council members, the City, and Mr. Warren (the former Chief of Police), and/or Mr. Benak, and/or Ms. Moore, in their policy-making and/or supervisory official capacities. This conduct, in the aggregate, amounted to deliberate indifference not only to Mr. Simoens' right to adequate medical attention, but to the similar rights of other detainees over a substantial period of time.

82.     The above-described conduct of Defendants who acted in supervisory official capacities over the jail either created the customs or policies under which the above-described unconstitutional practices occurred, or allowed such policies to continue.

83.     The Defendants who acted in a supervisory official capacity over the jail were grossly negligent in managing the subordinates, *i.e.*, Defendants Dankiw, Moore, Freeman,

Haefele, and Jane and John Does 1-24, who caused the unlawful events which occurred between September 7, 2007, and September 9, 2007.

84.     The institutional and official Defendants clearly violated the established constitutional rights of Mr. Simoens, of which a reasonable person would have known.

85.     As a direct and proximate result of the above-described violations of Mr. Simoens' constitutional rights, Mr. Simoens suffered the injuries described above.

86.     As a direct and proximate result of the above-described violations of Mr. Simoens' constitutional rights, Mr. Simoens died on September 11, 2007.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; Charles Benak; Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson; Chuck Sigerson, Jr.; Thomas Warren; the City of Omaha; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in the amount that is fair and reasonable; for attorney fees according to law; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

### Part 4:  State Law Claims

### Count III:  Wrongful Death
### (Failure to Provide Adequate Timely Healthcare)

For their Count III claim against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25 Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

87.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above.

88.     Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

89.    Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

90.    Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

91.    Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants: (a) voluntarily assumed an individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or was involuntarily assumed by them.

92.    Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants breached their respective duties to Mr. Simoens to ensure that his healthcare needs were met in a timely and adequate manner during his detention because they negligently:

a.    Failed to know and understand that because Mr. Simoens' detention had deprived him of his right to make his own medical decisions and act on them freely, Mr. Simoens had a right to have his medical needs met in a timely and adequate manner;

b.    Failed to perform any pre-admission medical screening of Mr. Simoens, or if one was performed it was done in a grossly inadequate manner;

c.    Failed to perform any prompt post-admission medical screening, as an alternative to a pre-admission screening, or if one was performed it was done in a grossly inadequate manner;

d.      Failed to adequately communicate Mr. Simoens' medical condition and/or medical complaints between shifts;

e.      Failed to document Mr. Simoens' medical condition and/or medical complaints in a timely and adequate manner;

f.      Failed to properly observe Mr. Simoens on any schedule required by law, or by the rules, regulations, policies or procedures of the City or of the Omaha Police Department, or to observe Mr. Simoens more frequently than any such policy might require under the particular facts and circumstances existing during his detention, so as to be aware of his healthcare needs in sufficient time to adequately meet those needs;

g.      Failed to respond to Mr. Simoens' repeated requests for help and medical attention;

h.      Failed to detain Mr. Simoens in a location within the jail where it was possible or reasonably likely for Mr. Simoens to be heard by someone in the event he was physically ill, or pleading for medical help;

i.      Engaged in a long-term and ongoing custom and practice of disregarding the medical needs of detainees, in whole or in part because of the adverse effect on the jail's budget as a result of actually providing medical care;

j.      Failed to recognize and respond in a timely manner to Mr. Simoens' medical problems;

k.      Allowed Mr. Simoens' medical condition to deteriorate to the point of collapse and imminent death, followed by death;

l.      Failed to call for a physician to examine Mr. Simoens prior to admission or immediately thereafter when Mr. Simoens stated he had a medical problem which required medication;

m.      Failed to provide an examination and treatment by a physician the first time Mr. Simoens asked for help;

n.      Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens asked for help;

o.   Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited;

p.   Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited;

q.   Failed to provide an examination and treatment by a physician the first time Mr. Simoens vomited blood;

r.   Failed to provide an examination and treatment by a physician each and every time thereafter that Mr. Simoens vomited blood;

s.   Failed to follow any guidelines that might have existed at the time of the events giving rise to this litigation, in the jail's operation and procedure manual (or any other document providing that function, regardless of its name) relating to meeting the medical needs of detainees, including but not limited to Mr. Simoens;

t.   Failed to regularly, personally observe Mr. Simoens with sufficient frequency to enable them to promptly detect and meet the medical needs of Mr. Simoens;

u.   Failed to conduct once a day "medical inspection" of Mr. Simoens, by personally questioning him about his health and medical condition;

v.   Failed to properly document the once-a-day "medical inspections" if any were in fact done;

w.   Failed to recognize and understand that vomiting without blood is a known sign of potential internal bleeding requiring medical attention;

x.   Failed to recognize and understand that vomiting blood is an even stronger indication of potential internal bleeding with an even higher degree of necessity for medical attention, and

were otherwise negligent in providing timely and adequate healthcare to Mr. Simoens in a manner not presently known to Plaintiffs.

93.   As a direct and proximate result of the above-described joint and several negligence of Defendants Dankiw, Moore, Freeman, Haefele, and the Doe Defendants, Mr. Simoens died on September 11, 2007

94. As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

### Count IV: Survival Action
### (Failure to Provide Adequate Timely Healthcare)

For their Count IV claim against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

95. Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above, and Paragraphs 88 through 92 in Count III.

96. As a direct and proximate result of the joint and several negligence of Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Joachim Dankiw; Jeanelle Moore; Andrew Freeman; Mark Haefele; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count V: Wrongful Death
### (Failure to Adopt and Enforce Adequate Policies
### to Ensure City Jail Detainees' Healthcare Needs
### are met in a Timely and Adequate Manner)

For their Count V claim against Defendants Thomas Warren, Charles Benak, John and Jane Does 1-14, and John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

97.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above.

98.     Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

99.     Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

100.    Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

101.    Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants, the City and its agents, servants and employees:  (a) voluntarily assumed an individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the

$-29-$

jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or were involuntarily assumed by them.

102. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew that from time to time Omaha police officers acting in the course and scope of their employment would arrest various persons for various reasons and bring them to the jail for detention.

103. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew, or should have known, or in the exercise of reasonable care could have known, that before an adult is arrested by an Omaha police officer, that adult has the right, power, freedom and ability to make medical decisions for himself and act on those decisions without supervision or control of the City or any of the City's agents, servants or employees.

104. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew, or should have known, or in the exercise of reasonable care could have known that when an adult is arrested and detained in the jail: (a) he automatically loses the right to make his own medical decisions and the right to act on them so long as he is in custody; (b) voluntarily or involuntarily, his right to make and act on his own medical decisions is transferred to the City and its agents, servants and employees, and (c) the City and its agents, servants and employees owe him a duty to meet his medical needs in a timely and adequate manner.

105. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and one or more of the Doe Defendants had a duty to adopt and enforce adequate rules, regulations, policies and procedures ("policies") to ensure that the medical needs of detainees were met in a timely and adequate manner so as to avoid injury or death to any detainee, or alternatively, to modify and enforce pre-existing rules, regulations, policies and procedures, *i.e.*, policies which existed prior to their respective hire dates as agents, servants or employees of the City, in order to accomplish that goal.

106. Defendants Warren, Benak and the Doe Defendants breached their respective duties to establish and enforce adequate policies to ensure that the medical needs of detainees

were met in a timely and adequate manner so as to avoid injury or death to any detainee, because they negligently failed to establish and/or enforce policies:

a. That fostered or promoted the establishment and long-term continuation of an atmosphere or work environment at the jail where detention and on-site or on call medical personnel, or medically trained personnel (if any) were not expressly or implicitly encouraged to disregard the serious medical needs of detainees, in whole or in part because of the adverse financial consequences to the budget allocated to the jail if there were multiple events of providing potentially expensive health care services during any one fiscal year;

b. That ensured that emergency medical treatment of detainees could be accomplished in a reasonable time frame;

c. That provided on-site, licensed medical personnel, or at a minimum on-site personnel with sufficient medical training to recognize the need for medical treatment for a detainee by licensed medical professionals, and provided those persons with sufficient authority to ensure that physicians or other appropriate health care providers were available on both a non-emergency and emergency basis;

d. That ensured the distribution and enforcement of an adequate plan to respond to both non-emergency and emergency medical needs of detainees, including but not limited to Mr. Simoens;

e. That provided a reasonably equipped, reasonably staffed emergency medical response team;

f. That established and enforced a clear system that would enable the medical requests of detainees, including the multiple requests of Mr. Simoens here, to be promptly reviewed by medically-trained jail personnel and acted upon in a timely and adequate manner;

g. That allowed the jail to be adequately staffed at all times, given the knowledge that understaffing significantly increased the risk of harm to detainees, including but not limited to the likelihood that detainees' serious medical needs, including those of Mr. Simoens, would go untreated;

h.    That created and enforced a system of pre-admission medical screening by appropriately trained and/or licensed medical personnel;

i.    That ensured adequate supervision and training of City employees assigned to work in the jail, with particular reference to recognizing the serious medical needs of detainees and the obligation to provide them, including Mr. Simoens, with prompt medical attention;

j.    That ensured adequate supervision and training of jail employees to ensure that the medical needs of detainees, including Mr. Simoens, are met;

k.    That ensured adequate communications between shifts at the jail concerning the individual detainees, both generally and with particular reference to the medical condition or status of detainees, including Mr. Simoens;

l.    That ensured the existence of a methodology of systematic and documented personal observation of all detainees, twenty-four hours a day, on a sufficiently regular basis so as to ensure prompt recognition of a detainee's medical needs and equally prompt meeting of those needs;

m.    That prevented the creation and long-term existence of the practice of disregarding the serious medical needs of detainees;

n.    That provided for prompt medical treatment for a detainee when he showed physical signs of a medical need, including but not limited to Mr. Simoens lying in the fetal position on the floor of his cell, moaning in agony; his repeated pleas for medical attention, and his vomiting both gastric contents and ultimately blood;

o.    That provided an adequate system to obtain prompt medical treatment for a detainee who requests such assistance and who provides a verbal explanation of symptoms, such as Mr. Simoens did, which would lead a reasonable person to conclude Mr. Simoens had serious medical needs;

p.    That ensured adequate supervision of jail employees, including those on duty during the time Mr. Simoens was detained at the jail, to ensure that the serious medical needs of detainees are met;

q.      That required annual continuing education in jail operations, including but not limited to initial or refresher courses in meeting the serious medical needs of detainees;

r.      That trained jail employees to recognize the signs of actual or potential internal bleeding, including but not limited to vomiting, and/or vomiting that included blood;

s.      That ensured that every agent, servant and/or employee of the City working at the jail knew and understood that all medical matters involving or requiring medical judgment were the sole province of the jail's responsible physician;

t.      That there was a responsible physician on-site or on call for all shifts at the jail;

u.      That ensured that inmates' health complaints were solicited daily, acted on by health-trained detention personnel, and followed by appropriate triage and treatment by qualified health professionals;

v.      That ensured that on arrival at the jail a medical screening is performed by health-trained or qualified health care professionals on all detainees, with the screening including, but not being limited to, inquiries into a detainee's current illness and health problems; use of medications; health problems diagnosed by the detainee's physician; and appropriate observation of the detainee's person and conduct; and

w.      That detention and other personnel were trained to respond to health-related situations within a very short time frame, with the training program being developed by the jail's responsible health authority in cooperation with the administrator/manager/supervisor of the jail, and including, but not being limited to, recognition of signs and symptoms and knowledge of the actions to be taken in an emergency, including signs and symptoms of internal bleeding, and

were otherwise negligent in a manner not presently known to Plaintiffs.

107.    As a direct and proximate result of the above-described joint and several negligence of Defendants Warren, Benak and the Doe Defendants, Mr. Simoens died on September 11, 2007.

108.     As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Thomas Warren; Charles Benak, John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

### Count VI: Survival Action
### (Failure to Adopt and Enforce Adequate Policies
### to Ensure City Jail Detainees' Healthcare Needs
### are met in a Timely and Adequate Manner)

For their Count VI claim against Defendants Thomas Warren; Charles Benak; John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

109.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above, and Paragraphs 98 through 106 in Count V.

110.     As a direct and proximate result of the joint and several negligence of Defendants Warren, Benak and the Doe Defendants, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Thomas Warren; Charles Benak; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

**Count VII: Wrongful Death**
**(Failure to Adopt and Enforce Adequate Policies**
**to Ensure City Jail Detainees' Healthcare Needs**
**are met in a Timely and Adequate Manner)**

For their Count VII claim against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr. (hereinafter, collectively, "the City Council members"), Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

111.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above.

112.    Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

113.    Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

114.    Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

115.    Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants, the City and its agents, servants and employees:  (a) voluntarily assumed an

individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or were involuntarily assumed by them.

116. Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew that from time to time Omaha police officers acting in the course and scope of their employment would arrest various persons for various reasons and bring them to the jail for detention.

117. Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew, or should have known, or in the exercise of reasonable care could have known, that before an adult is arrested by an Omaha police officer, that adult has the right, power, freedom and ability to make medical decisions for himself and act on those decisions without supervision or control of the City or any of the City's agents, servants or employees.

118. Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew, or should have known, or in the exercise of reasonable care could have known that when an adult is arrested and detained in the jail: (a) he automatically loses the right to make his own medical decisions and the right to act on them so long as he is in custody; (b) voluntarily or involuntarily, his right to make and act on his own medical decisions is transferred to the City and its agents, servants and employees, and (c) the City and its agents, servants and employees owe him a duty to meet his medical needs in a timely and adequate manner.

119. Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members had a duty to adopt and enforce adequate rules, regulations, policies and procedures ("policies") to ensure that the medical needs of detainees were met in a timely and adequate manner so as to avoid injury or death to any detainee, or alternatively, to modify and enforce pre-existing rules, regulations, policies and procedures, *i.e.*, policies which existed prior to the respective dates on which they became members of the City Council, in order to accomplish that goal.

120. The City Council members breached their respective duties to adopt and enforce, or alternatively to ensure the adoption and enforcement of adequate policies to ensure that the medical needs of detainees were met in a timely and adequate manner so as to avoid

injury or death to any detainee, because they negligently failed to adopt and enforce, or alternatively, to ensure the adoption and enforcement of policies:

a.    That fostered or promoted the establishment and long-term continuation of an atmosphere or work environment at the jail where detention and on-site on-call medical personnel, or medically trained personnel (if any) were not encouraged to disregard the serious medical needs of detainees, in whole or in part because of the adverse financial consequences to the budget allocated to the jail if there were multiple events of providing potentially expensive health care services during any one fiscal year;

b.    That ensured that emergency medical treatment of detainees could be accomplished in a reasonable time frame;

c.    That provided on-site, licensed medical personnel, or at a minimum on-site personnel with sufficient medical training to recognize the need for medical treatment for a detainee, and provided those persons with sufficient authority to ensure that physicians or other appropriate health care providers were available on both a non-emergency and emergency basis;

d.    That ensured the distribution and enforcement of an adequate plan to respond to both non-emergency and emergency medical needs of detainees, including but not limited to Mr. Simoens;

e.    That provided a reasonably equipped, reasonably staffed emergency medical response team;

f.    That established and enforced a clear system that would enable the medical requests of detainees, including the multiple requests of Mr. Simoens here, to be promptly reviewed by medically-trained medical personnel and acted upon in a timely and adequate manner;

g.    That allowed the jail to be adequately staffed at all times, given the knowledge that understaffing significantly increases the risk of harm to detainees, including but not limited to the likelihood that detainees' serious medical needs, including those of Mr. Simoens, would go untreated;

h. That created and enforced a system of pre-admission medical screening by appropriately trained and/or licensed medical personnel;

i. That ensured adequate supervision and training of City employees assigned to work in the jail, with particular reference to recognizing the serious medical needs of detainees and the obligation to provide them, including Mr. Simoens, with prompt medical attention;

j. That ensured adequate supervision and training of City Jail employees to ensure that the serious medical needs of detainees, including Mr. Simoens, are met;

k. That ensured adequate communications between shifts at the jail concerning the individual detainees, both generally and with particular reference to the medical condition or status of detainees, including Mr. Simoens;

l. That ensured the existence of a methodology of systematic and documented personal observation of all detainees, twenty-four hours a day, on a sufficiently regular basis so as to ensure prompt recognition of a detainee's medical needs and equally prompt meeting of those needs;

m. That prevented the creation and long-term existence of the practice of disregarding the serious medical needs of detainees;

n. That provided for prompt medical treatment for a detainee when he shows physical signs of a serious medical need, including but not limited to Mr. Simoens lying in the fetal position on the floor of his cell, moaning in agony; his repeated pleas for medical attention, and his vomiting both gastric contents and ultimately blood;

o. That provided an adequate system to obtain prompt medical treatment for a detainee who requests such assistance and who provides a verbal explanation of symptoms, such as Mr. Simoens did, that would lead a reasonable person to conclude Mr. Simoens had serious medical needs;

p. That ensured adequate supervision of City Jail employees, including those on duty during the time Mr. Simoens was detained at the jail, to ensure that the serious medical needs of detainees are met;

q.   That required annual continuing education in jail operations, including but not limited to initial or refresher courses in meeting the serious medical needs of detainees;

r.   That trained jail employees to recognize the signs of actual or potential internal bleeding, including but not limited to vomiting, and/or vomiting that included blood;

s.   That ensured that every agent, servant and/or employee of the City working at the jail knew and understood that all medical matters involving or requiring medical judgment are the sole province of the jail's responsible physician;

t.   That there was a responsible physician on-site or on call for all shifts at the jail;

u.   That ensured that inmates' health complaints are solicited daily, acted on by health-trained detention personnel, and followed by appropriate triage and treatment by qualified health professionals;

v.   That ensured that on arrival at the jail a medical screening is performed by health-trained or qualified health care professionals on all detainees, with the screening including, but not being limited to, inquiries into a detainee's current illness and health problems; use of medications; health problems diagnosed by the detainee's physician; and appropriate observation of the detainee's person and conduct;

w.   That ensured detention and other personnel are trained to respond to health-related situations within a very short time frame, with the training program being developed by the jail's responsible health authority in cooperation with the administrator/manager/supervisor of the jail, and including, but not being limited to, recognition of signs and symptoms and knowledge of the actions to be taken in an emergency, including signs and symptoms of internal bleeding;

x.   That ensured the jail was sufficiently staffed during all shifts so as to enable the medical needs to detainees to be met;

y.   That ensured that a physician was retained to at a minimum be on call in case of a medical emergency for one of the detainees, or to meet other medical needs of detainees;

z.     That ensured that at least one person with appropriate medical training was on duty for every shift so as to meet the emergency and/or non-emergency medical needs of detainees,

were otherwise negligent in a manner not presently known to Plaintiffs.

121.     As a direct and proximate result of the above-described joint and several negligence of the City Council members, Mr. Simoens died on September 11, 2007.

122.     As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr., jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

### Count VIII: Survival Action
### (Failure to Adopt and Enforce Adequate Policies
### to Ensure City Jail Detainees' Healthcare Needs
### are met in a Timely and Adequate Manner)

For their Count VIII claim against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr., Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

123.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above, and Paragraphs 112 through 120 in Count VII.

124.     As a direct and proximate result of the joint and several negligence of the City Council members, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr.,

jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count IX: Wrongful Death
### (Failure to Adopt and Enforce Adequate Policies
### to Ensure City Jail Detainees' Medical Needs
### are met in a Timely and Adequate Manner)

For their Count IX claim against Defendant City of Omaha, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

125. Plaintiffs incorporate by reference Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above.

126. Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

127. Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

128. Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

129. Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe

Defendants, the City and its agents, servants and employees: (a) voluntarily assumed an individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or were involuntarily assumed by them.

130. Before Mr. Simoens' arrest and detention on September 7, 2007, the City knew that from time to time Omaha police officers acting in the course and scope of their employment would arrest various persons for various reasons and bring them to the jail for detention.

131. Before Mr. Simoens' arrest and detention on September 7, 2007, the City knew, or should have known, or in the exercise of reasonable care could have known, that before an adult is arrested by an Omaha police officer, that adult has the right, power, freedom and ability to make medical decisions for himself and act on those decisions without supervision or control of the City or any of the City's agents, servants or employees.

132. Before Mr. Simoens' arrest and detention on September 7, 2007, the City knew, or should have known, or in the exercise of reasonable care could have known that when an adult is arrested and detained in the jail: (a) he automatically loses the right to make his own medical decisions and the right to act on them so long as he is in custody; (b) voluntarily or involuntarily, his right to make and act on his own medical decisions is transferred to the City and its agents, servants and employees, and (c) the City and its agents, servants and employees owe him a duty to meet his medical needs in a timely and adequate manner.

133. Before Mr. Simoens' arrest and detention on September 7, 2007, the City had a duty to adopt and enforce adequate rules, regulations, policies and procedures ("policies") to ensure that the medical needs of detainees were met in a timely and adequate manner so as to avoid injury or death to any detainee.

134. The City breached its duty to adopt and enforce, or alternatively to ensure the adoption and enforcement of, adequate policies to ensure that the healthcare needs of detainees were met in a timely and adequate manner so as to avoid injury or death to any detainee, because the City negligently failed to adopt and enforce, or alternatively, to ensure the adoption and enforcement of policies:

a. That fostered or promoted the establishment and long-term continuation of an atmosphere or work environment at the jail where detention and on-site on-call

medical personnel, or medically trained personnel (if any) were not encouraged to disregard the serious medical needs of detainees, in whole or in part because of the adverse financial consequences to the budget allocated to the jail if there were multiple events of providing potentially expensive health care services during any one fiscal year;

b.  That ensured that emergency medical treatment of detainees could be accomplished in a reasonable time frame;

c.  That provided on-site, licensed medical personnel, or at a minimum on-site personnel with sufficient medical training to recognize the need for medical treatment for a detainee, and provided those persons with sufficient authority to ensure that physicians or other appropriate health care providers were available on both a non-emergency and emergency basis;

d.  That ensured the distribution and enforcement of an adequate plan to respond to both non-emergency and emergency medical needs of detainees, including but not limited to Mr. Simoens;

e.  That provided a reasonably equipped, reasonably staffed emergency medical response team;

f.  That established and enforced a clear system that would enable the medical requests of detainees, including the multiple requests of Mr. Simoens here, to be promptly reviewed by medically-trained medical personnel and acted upon in a timely and adequate manner;

g.  That allowed the jail to be adequately staffed at all times, given the knowledge that understaffing significantly increases the risk of harm to detainees, including but not limited to the likelihood that detainees' serious medical needs, including those of Mr. Simoens, would go untreated;

h.  That created and enforced a system of pre-admission medical screening by appropriately trained and/or licensed medical personnel;

i.  That ensured adequate supervision and training of City employees assigned to work in the jail, with particular reference to recognizing the serious medical

needs of detainees and the obligation to provide them, including Mr. Simoens, with prompt medical attention;

j.    That ensured adequate supervision and training of City Jail employees to ensure that the serious medical needs of detainees, including Mr. Simoens, are met;

k.    That ensured adequate communications between shifts at the jail concerning the individual detainees, both generally and with particular reference to the medical condition or status of detainees, including Mr. Simoens;

l.    That ensured the existence of a methodology of systematic and documented personal observation of all detainees, twenty-four hours a day, on a sufficiently regular basis so as to ensure prompt recognition of a detainee's medical needs and equally prompt meeting of those needs;

m.    That prevented the creation and long-term existence of the practice of disregarding the serious medical needs of detainees;

n.    That provided for prompt medical treatment for a detainee when he shows physical signs of a serious medical need, including but not limited to Mr. Simoens lying in the fetal position on the floor of his cell, moaning in agony; his repeated pleas for medical attention, and his vomiting both gastric contents and ultimately blood;

o.    That provided an adequate system to obtain prompt medical treatment for a detainee who requests such assistance and who provides a verbal explanation of symptoms, such as Mr. Simoens did, that would lead a reasonable person to conclude Mr. Simoens had serious medical needs;

p.    That ensured adequate supervision of City Jail employees, including those on duty during the time Mr. Simoens was detained at the jail, to ensure that the serious medical needs of detainees are met;

q.    That required annual continuing education in jail operations, including but not limited to initial or refresher courses in meeting the serious medical needs of detainees;

r.    That trained jail employees to recognize the signs of actual or potential internal bleeding, including but not limited to vomiting, and/or vomiting that included blood;

s.    That ensured that every agent, servant and/or employee of the City working at the jail knew and understood that all medical matters involving or requiring medical judgment are the sole province of the jail's responsible physician;

t.    That there was a responsible physician on-site or on call for all shifts at the jail;

u.    That ensured that inmates' health complaints are solicited daily, acted on by health-trained detention personnel, and followed by appropriate triage and treatment by qualified health professionals;

v.    That ensured that on arrival at the jail a medical screening is performed by health-trained or qualified health care professionals on all detainees, with the screening including, but not being limited to, inquiries into a detainee's current illness and health problems; use of medications; health problems diagnosed by the detainee's physician; and appropriate observation of the detainee's person and conduct;

w.    That ensured detention and other personnel are trained to respond to health-related situations within a very short time frame, with the training program being developed by the jail's responsible health authority in cooperation with the administrator/manager/supervisor of the jail, and including, but not being limited to, recognition of signs and symptoms and knowledge of the actions to be taken in an emergency, including signs and symptoms of internal bleeding;

x.    That ensured the jail was sufficiently staffed during all shifts so as to enable the medical needs to detainees to be met;

y.    That ensured that a physician was retained to at a minimum be on call in case of a healthcare emergency for one of the detainees, or to meet other healthcare needs of detainees;

z.    That ensured that at least one person with appropriate healthcare training was on duty for every shift so as to meet the emergency and/or non-emergency healthcare needs of detainees, and

the City was otherwise negligent in a manner not presently known to Plaintiffs.

135. As a direct and proximate result of the above-described negligence of the City, Mr. Simoens died on September 11, 2007.

136. As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant City of Omaha for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

### Count X: Survival Action
### (Failure to Adopt and Enforce Adequate Policies
### to Ensure City Jail Detainees' Medical Needs
### are met in a Timely and Adequate Manner)

For their Count X claim against Defendant City of Omaha, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

137. Plaintiffs incorporate by reference Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above, and Paragraphs 128 through 134 of Count IX.

138. As a direct and proximate result of the above-described negligence of the City, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant City of Omaha for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count XI: Wrongful Death
## (Negligent Training and Supervision)

For their Count XI claim against Defendants Thomas Warren, Charles Benak, John and Jane Does 1-14, and John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

139. Plaintiffs incorporate by reference Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above.

140. Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

141. Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

142. Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

143. Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants, the City and its agents, servants and employees: (a) voluntarily assumed an individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the

jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or were involuntarily assumed by them.

144. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew that from time to time Omaha police officers acting in the course and scope of their employment would arrest various persons for various reasons and bring them to the jail for detention.

145. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew, or should have known, or in the exercise of reasonable care could have known, that before an adult is arrested by an Omaha police officer, that adult has the right, power, freedom and ability to make medical decisions for himself and act on those decisions without supervision or control of the City or any of the City's agents, servants or employees.

146. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew, or should have known, or in the exercise of reasonable care could have known that when an adult is arrested and detained in the jail: (a) he automatically loses the right to make his own medical decisions and the right to act on them so long as he is in custody; (b) voluntarily or involuntarily, his right to make and act on his own medical decisions is transferred to the City and its agents, servants and employees, and (c) the City and its agents, servants and employees owe him a duty to meet his medical needs in a timely and adequate manner.

147. Before Mr. Simoens' arrest and detention on September 7, 2007, Defendants Warren, Benak and the Doe Defendants had a duty to adopt and enforce adequate rules, regulations, policies and procedures ("policies") to ensure that the medical needs of detainees were met in a timely and adequate manner so as to avoid injury or death to any detainee, or alternatively, to modify and enforce pre-existing rules, regulations, policies and procedures, *i.e.*, policies which existed prior to the respective hire dates, in order to accomplish that goal.

148. While Mr. Simoens was under the control and supervision of the City and its agents, servants and employees, Mr. Simoens had a right to be free from mental, physical and/or emotional abuse, including but not limited to the abuse described in Paragraphs 28 through 49 in Part 2 above.

149.     Before the arrest and detention of Mr. Simoens, Defendants Warren, Benak and the Doe Defendants knew that Mr. Simoens had a right to be free from intentionally or negligently inflicted physical, mental and/or emotional abuse by agents, servants and employees of the City during his detention at the jail.

150.     Before the arrest and detention of Mr. Simoens on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew that in order for the emergency and/or non-emergency healthcare needs of detainees to be adequately met, all City employees assigned to work at the jail on any shift had to be adequately trained and adequately supervised in order to meet the medical needs of detainees.

151.     Prior to the detention of Mr. Simoens on September 7, 2007, Defendants Warren, Benak and the Doe Defendants knew that in order for detainees such as Mr. Simoens to be free from intentionally and/or negligently inflicted physical, mental and emotional abuse by agents, servants and employees of the City while in custody at the jail, including but not limited to failing to meet the medical needs of detainees in a timely and adequate manner, all City employees assigned to work at the jail on any shift had to be adequately trained and supervised in order to prevent such conduct.

152.     Defendants Warren, Benak and the Doe Defendants breached their respective duties of training by negligently failing to adequately train Defendants Dankiw, Moore, Freeman, Haefele and one or more of the non-supervisory Doe Defendants, in that they individually and collectively failed to act as a reasonably prudent person would have acted in a similar circumstance involving training of jail employees, and failed to act in a manner sufficient to stop or prevent these Defendants from engaging in the conduct described above, and to avoid or prevent the treatment of Mr. Simoens described above.

153.     Defendants Warren, Benak and the Doe Defendants breached their respective duties of supervision by negligently failing to adequately supervise Defendants Dankiw, Moore, Freeman, Haefele and one or more of the non-supervisory Doe Defendants, in that they individually and collectively failed to act as a reasonably prudent person would have acted in a similar circumstance involving the supervision of jail employees, and failed to act in a manner sufficient to stop or prevent these Defendants from engaging in the conduct described above, and to avoid or prevent the treatment of Mr. Simoens described above.

154.     As a direct and proximate result of the above-described joint and several negligence of Defendants Warren, Benak and the Doe Defendants, Mr. Simoens died on September 11, 2007.

155.     As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Thomas Warren; Charles Benak, John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

**Count XII:  Survival Action**
**(Negligent Training and Supervision)**

For their Count XII claim against Defendants Thomas Warren; Charles Benak; John and Jane Does 15-25, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

156.     Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above, and Paragraphs 140 through 153 of Count XI.

157.     As a direct and proximate result of the joint and several negligence of Defendants Warren, Benak and the Doe Defendants, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Thomas Warren; Charles Benak; John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count XIII: Wrongful Death
## (Negligent Training and Supervision)

For their Count XIII claim against Defendant Jeanelle Moore, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

158. Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above.

159. Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

160. Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

161. Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

162. Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants, the City and its agents, servants and employees: (a) voluntarily assumed an individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or were involuntarily assumed by them.

163.     Before Mr. Simoens' arrest and detention on September 7, 2007, Ms. Moore knew that from time to time Omaha police officers acting in the course and scope of their employment would arrest various persons for various reasons and bring them to the jail for detention.

164.     Before Mr. Simoens' arrest and detention on September 7, 2007, Ms. Moore knew, or should have known, or in the exercise of reasonable care could have known, that before an adult is arrested by an Omaha police officer, that adult has the right, power, freedom and ability to make medical decisions for himself and act on those decisions without supervision or control of the City or any of the City's agents, servants or employees.

165.     Before Mr. Simoens' arrest and detention on September 7, 2007, Ms. Moore knew, or should have known, or in the exercise of reasonable care could have known that when an adult is arrested and detained in the jail: (a) he automatically loses the right to make his own medical decisions and the right to act on them so long as he is in custody; (b) voluntarily or involuntarily, his right to make and act on his own medical decisions is transferred to the City and its agents, servants and employees, and (c) the City and its agents, servants and employees owe him a duty to meet his medical needs in a timely and adequate manner.

166.     While Mr. Simoens was under the control and supervision of the City and its agents, servants and employees, Mr. Simoens had a right to be free from mental, physical and/or emotional abuse, including but not limited to the abuse described in Paragraphs 28 through 49 in Part 2 above.

167.     Before the arrest and  detention of Mr. Simoens, Ms. Moore knew that Mr. Simoens had a right to be free from intentionally or negligently inflicted physical, mental and/or emotional abuse by agents, servants and employees of the City during his detention at the jail.

168.     Before Mr. Simoens' arrest and detention on September 7, 2007, Ms. Moore knew, or should have known, or in the exercise of reasonable care could have known, that in order for the emergency and/or non-emergency medical needs of detainees to be adequately met, all City employees assigned to work at the jail on any shift had to be adequately trained and adequately supervised in order to meet the medical needs of detainees.

169.     Before Mr. Simoens' arrest and detention on September 7, 2007, Ms. Moore knew, or should have known, or in the exercise of reasonable care could have known, that in

order for detainees such as Mr. Simoens to be free from intentionally and/or negligently inflicted physical, mental and emotional abuse by agents, servants and employees of the City while in custody at the jail, including but not limited to failing to meet the medical needs of detainees in a timely and adequate manner, all City employees assigned to work at the jail on any shift had to be adequately trained and supervised in order to prevent such conduct.

170. Ms. Moore breached her duty of training by negligently failing to adequately train Defendants Dankiw, Freeman, Haefele and one or more of the non-supervisory Doe Defendants, in that she failed to act as a reasonably prudent person would have acted in a similar circumstance involving training of jail employees, and failed to act in a manner sufficient to stop or prevent these Defendants from engaging in the conduct described above, and to avoid or prevent the treatment of Mr. Simoens described above.

171. Ms. Moore breached her duty of supervision by negligently failing to adequately supervise Defendants Dankiw, Freeman, Haefele and one or more of the non-supervisory Doe Defendants, in that she failed to act as a reasonably prudent person would have acted in a similar circumstance involving the supervision of jail employees, and failed to act in a manner sufficient to stop or prevent these Defendants from engaging in the conduct described above, and to avoid or prevent the treatment of Mr. Simoens described above.

172. As a direct and proximate result of the above-described supervisory negligence of Ms. Moore, Mr. Simoens died on September 11, 2007.

173. As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Thomas Warren; Charles Benak, John and Jane Does 1-14, and John and Jane Does 15-25, jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count XIV: Survival Action
### (Negligent Training and Supervision)

For their Count XIV claim against Defendant Jeanelle Moore, Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

174. Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70 above, and Paragraphs 159 through 171 in Count XIII.

175. As a direct and proximate result of the negligence of Defendant Jeanelle Moore, Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant Jeanelle Moore for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

## Count XV: Wrongful Death
### (Negligent Training and Supervision)

For their Count XV claim against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr. (hereinafter, collectively, "the City Council members"), Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

176. Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70.

177. Before Mr. Simoens was arrested for the traffic violations, he had the right, power, freedom and ability to decide what to do about his medical needs and to act on his decisions. He had the right to do that without the supervision or control of the City or any agent, servant or employee of the City.

178.     Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, Mr. Simoens was deprived of, and no longer had, the right, power, freedom or ability to decide what to do about his medical needs and to act on his decisions, whether by doing something himself, or by asking for help from doctors or other healthcare providers of his own choice.

179.     Beginning with Mr. Simoens' arrest on September 7, 2007, and continuing at least through the time the ambulance took him away from the jail on September 9, 2007, if not longer, the City and its agents, servants and employees had absolute and exclusive control over Mr. Simoens' person with, and absolute and exclusive control over all decisions about his health, including if, when and how his medical needs would be met.

180.     Because of the Omaha police officers' decision to arrest Mr. Simoens and detain him in the City Jail, thereby giving the City and its agents, servants and employees the sole right to make all medical decisions for Mr. Simoens, the City and its agents, servants and employees, including but not limited to Defendants Dankiw, Moore, Freeman, Haefele and the Doe Defendants, the City and its agents, servants and employees: (a) voluntarily assumed an individual and/or collective duty to give Mr. Simoens adequate, timely medical care while in the jail, or (b) the duty to provide him with adequate, timely medical care was imposed on them, and/or were involuntarily assumed by them.

181.     Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew that from time to time Omaha police officers acting in the course and scope of their employment would arrest various persons for various reasons and bring them to the jail for detention.

182.     Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew, or should have known, or in the exercise of reasonable care could have known, that before an adult is arrested by an Omaha police officer, that adult has the right, power, freedom and ability to make medical decisions for himself and act on those decisions without supervision or control of the City or any of the City's agents, servants or employees.

183.     Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew, or should have known, or in the exercise of reasonable care could have known that when an adult is arrested and detained in the jail: (a) he automatically loses the right

to make his own medical decisions and the right to act on them so long as he is in custody; (b) voluntarily or involuntarily, his right to make and act on his own medical decisions is transferred to the City and its agents, servants and employees, and (c) the City and its agents, servants and employees owe him a duty to meet his medical needs in a timely and adequate manner.

184. While Mr. Simoens was under the control and supervision of the City and its agents, servants and employees, Mr. Simoens had a right to be free from mental, physical and/or emotional abuse, including but not limited to the abuse described in Paragraphs 28 through 49 in Part 2 above.

185. Before the arrest and detention of Mr. Simoens, the City Council members knew that Mr. Simoens had a right to be free from intentionally or negligently inflicted physical, mental and/or emotional abuse by agents, servants and employees of the City during his detention at the jail.

186. Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew, or should have known, or in the exercise of reasonable care could have known, that in order for the emergency and/or non-emergency medical needs of detainees to be adequately met, all City employees assigned to work at the jail on any shift had to be adequately trained and adequately supervised in order to meet the medical needs of detainees.

187. Before Mr. Simoens' arrest and detention on September 7, 2007, the City Council members knew, or should have known, or in the exercise of reasonable care could have known, that in order for detainees such as Mr. Simoens to be free from intentionally and/or negligently inflicted physical, mental and emotional abuse by agents, servants and employees of the City while in custody at the jail, including but not limited to failing to meet the medical needs of detainees in a timely and adequate manner, all City employees assigned to work at the jail on any shift had to be adequately trained and supervised in order to prevent such conduct.

188. The City Council members individually and collectively breached their respective duties of training by negligently failing to adequately train or ensure the adequate training of Defendants Warren, Benak, Dankiw, Moore, Freeman, Haefele and one or more of the non-supervisory Doe Defendants, in that they individually and collectively failed to act as a reasonably prudent person would have acted in a similar circumstance involving training of jail employees, and failed to act in a manner sufficient to stop or prevent these Defendants from

engaging in the conduct described above, and to avoid or prevent the treatment of Mr. Simoens described above.

189.    The City Council members individually and collectively breached their respective duties of supervision by negligently failing to adequately supervise or ensure the adequate supervision of Defendants Warren, Benak, Dankiw, Moore, Freeman, Haefele and one or more of the non-supervisory Doe Defendants, in that they individually and collectively failed to act as a reasonably prudent person would have acted in a similar circumstance involving the supervision of jail employees, and failed to act in a manner sufficient to stop or prevent these Defendants from engaging in the conduct described above, and to avoid or prevent the treatment of Mr. Simoens described above.

190.    As a direct and proximate result of the above-described joint and several negligence of the City Council members, Mr. Simoens died on September 11, 2007.

191.    As a result of the death of Mr. Simoens, Plaintiffs suffered the loss of his society, comfort, companionship, counseling, advice; incurred funeral expenses, and suffered other pecuniary losses for which recovery is allowed by law.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr., jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

### Count XVI: Survival Action
### (Negligent Training and Supervision)

For their Count XVI claim against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr., Plaintiffs Elizabeth Higgins and Shawn Simoens, as co-Personal Representatives of the Estate of Alexander T. Simoens, deceased, and Elizabeth Higgins and Shawn Simoens, individually, as the daughter and son, and sole heirs at law, of Alexander T. Simoens, deceased, allege:

192.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 26, 28 through 58, 60, and 62 through 70, and Paragraphs 177 through 189 in Count XV.

193.    As a direct and proximate result of the joint and several negligence of Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr., Mr. Simoens suffered extreme physical, mental and emotional pain, suffering, distress and anguish in the time frame between his arrival at the jail on September 7, 2007, and his death at the hospital on September 11, 2007.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Jim Suttle; Frank Brown; Jim Vokal; Garry Gernandt; Dan Welch; Franklin Thompson, and Chuck Sigerson, Jr., jointly and severally, for compensatory damages in an amount that is fair and reasonable; for the costs Plaintiffs incur in this litigation, and for such other or further relief as the Court deems just and proper in the circumstances.

Date:  July 25 2008

/s/ Joseph P. Cullan
 Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576
Cullan & Cullan , LLC
1113 Harney Street
Omaha, NE  68102

Telephone:  (402) 397-7600
Fax:  (402) 397-3816
Email:
  joe@cullanlaw.com
  pat@cullanlaw.com

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues as provided by Rule 38(a) of the Federal Rules of Civil Procedure, or as otherwise provided by law.

/s/ Joseph P. Cullan
Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576
Cullan & Cullan , LLC
1113 Harney Street
Omaha, NE 68102
Telephone: (402) 397-7600
Fax: (402) 397-3816
Email: joe@cullanlaw.com
      pat@cullanlaw.com
Attorneys for Plaintiffs

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby designate Omaha as the place of trial.

/s/ Joseph P. Cullan
Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576
Cullan & Cullan , LLC
1113 Harney Street
Omaha, NE 68102
Telephone: (402) 397-7600
Fax: (402) 397-3816
Email: joe@cullanlaw.com
      pat@cullanlaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification and a copy of such filing to the following:

Thomas O. Mumgaard
tmumgaard@ci.omaha.ne.us
Attorney for Defendants.

/s/ Joseph P. Cullan
Joseph P. Cullan, #22145

/s/ Patrick J. Cullan
Patrick J. Cullan, #23576